**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

Case No. 13-2209

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BELLANDRA FOSTER; BBF )
ENGINEERING SERVICES, PC, )
  )
   Plaintiffs-Appellants, )
  )
v. )
  )
STATE OF MICHIGAN; MICHIGAN )
DEPARTMENT OF TRANSPORTATION )
  )
   Defendants, )
  )
and )
  )
VICTOR JUDNIC; MARK STEUCHER; )
RICK SNYDER, Governor of the State of )
Michigan; KIRK T. STEUDLE, Director of )
the Michigan Department of Transportation, )
  )
   Defendants-Appellees. )

FILED

Jul 16, 2014

DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

**Bernice B. Donald, Circuit Judge**. Bellandra Foster ("Foster") and her company BBF

Engineering Services, PC ("BBF") (collectively "Appellants") brought myriad claims against a

host of defendants, including Rick Snyder, in his official capacity as the Governor of Michigan;

Kirk T. Steudle, in his official capacity as the Director of the Michigan Department of

Transportation; and two former Michigan Department of Transportation ("MDOT") employees,

Victor Judnic and Mark Stuecher[1] (collectively "Appellees"). These claims generally revolve around the theory that certain MDOT employees discriminated against Foster and BBF because she is a black woman and then further retaliated against her when she sought to report their discrimination. On motions from the Appellees, the district court either dismissed or granted summary judgment on all of Appellants' claims. In jumbled filings so replete with errors that they border on being incomprehensible, Foster and BBF now appeal, arguing that the district court should not have granted any of Appellees' dispositive motions and seeking to revive all of their claims. For the following reasons, we **AFFIRM** the district court.

## FACTS

### I.    Background

BBF is a consulting firm that provides professional engineering services to clients including MDOT. BBF is certified as a Disadvantaged Business Enterprise ("DBE"),[2] and in 2008, BBF was MDOT's DBE Contractor of the Year. At its largest, BBF once employed seventeen full- and part-time employees. Bellandra Foster is BBF's president and sole shareholder. According to Foster, BBF began performing contract work for MDOT in 1997.

Rick Snyder is Michigan's Governor, and Kirk Steudle is MDOT's director. Both Victor Judnic and Mark Stuecher are former MDOT project engineers. Judnic was a project engineer at the Detroit Transportation Service Center ("TSC") from 2003 until March 2011, when he left MDOT to work in the private sector. From April 2007 until his departure, Judnic was the senior delivery engineer at the Detroit TSC. Stuecher worked for MDOT from 1984 until he moved to

---

[1] Incorrectly captioned as "Mark Steucher."
[2] "The U.S. Department of Transportation's DBE (disadvantaged business enterprise) program provides a vehicle for increasing the participation by [Minority Business Enterprises] in state and local procurement." United States Dept. of Trans., *Disadvantaged Business Enterprise (DBE) Program*, http://www.dot.gov/osdbu/disadvantaged-business-enterprise. "To be certified as a DBE, a firm must be a small business owned and controlled by socially and economically disadvantaged individuals." *Id*.

a private construction company in December 2010; from 1990 until his departure, he worked as a resident engineer.

MDOT awards construction contracts through a competitive bidding process, taking price into account. MDOT also contracts with professional engineering firms and consultants, who provide engineering services such as testing, inspection, and project oversight. MDOT selects its engineering consultants pursuant to the Brooks Act, 40 U.S.C. § 1101, and picks based on quality, not price. *See generally* 23 U.S.C. § 112(b)(2)(A). To that end, MDOT circulates a "Selection Guidelines for Service Contracts." To advertise the relevant details and planned scope of proposed contracts, MDOT publishes Requests for Proposals ("RFPs"). Interested firms must submit proposals outlining their qualifications, their personnel, and pertinent information regarding their proposed subconsultants.

When the value of a service contract exceeds $25,000, MDOT uses a selection team to evaluate proposals. The selection team assigns scores to each proposal based on a scoring worksheet, then tallies the scores and forwards them to the Central Selection Review Team in Lansing for final approval. The project manager will then request a "priced proposal" from the highest-scoring firm and start negotiating costs. If these negotiations fall through, MDOT will then turn to the firm with the next-highest rating. Once MDOT and the consultant reach an agreement, they enter into a contract for the project. *See generally* 40 U.S.C. §§ 1103(c)-(d), 1104(b). Foster claims that in this process the project engineer "has basically the ultimate power" because, according to her, the project engineer helps draft the RFP and largely picks the selection team. She further alleges that the project engineers often decide on the companies with whom they want to work even before the selection committee meets.

- 3 -

## II.     Facts Related to the Allegations Against Judnic

Sometime around 2006, Judnic's secretary, Marilyn Caldwell, heard Judnic say "no woman should be making that kind of money." Caldwell does not recall any details regarding when Judnic made this statement or what she was doing when she heard it. Further, she cannot "say one-hundred percent that it was directed at BBF or at someone else." Caldwell testified that this statement pertained exclusively to sex—not race—and that she cannot recall Judnic ever again making such a statement or any similar statements related to a person's nationality. Although Caldwell explained that she eventually told Foster about this statement, she cannot remember whether she told Foster immediately or even that same year. According to Appellants' theory of the case, this statement clearly referred to Foster—because BBF is one of the few, if not the only, engineering consulting firm owned by a minority woman—and is the smoking gun that reveals Judnic's race- and sex-based motivation for systematically trying to force BBF out of business.

In 2006, Judnic served as the project manager on an advertised as-needed $4.2 million project, Contract 2006-0490, for which BBF was the highest-scoring consultant. Before contract negotiations moved into the priced-proposal phase, and thus before the contract was actually awarded, Judnic's superiors instructed him to reduce the scope of the proposed work. A $2 million portion of the original project, M-10, was broken off and advertised under a new, separate RFP for which BBF did not submit a proposal. On September 25, 2006, MDOT, through Judnic, awarded the reduced-scope version of Contract 2006-0490, now a roughly $2.2 million project, to BBF. Although Judnic told Foster that the decision to cut the contract came from Lansing, Appellants argue that this reduced contract evinces Judnic's discriminatory intent because no other companies had their contracts cut.

In the evaluation for its work on Contract 2006-0490, BBF received two scores of "7" on a ten-point scale based on a lack of communication and project file deficiencies. Foster believes these scores were based on the performance of Love Charles, a long-time BBF employee who worked as an office-technician on the project. Affidavits in the record from several MDOT employees document the issues with Charles's work. In a later meeting on July 18, 2008, Judnic and another MDOT employee, Jason Voigt, met with Foster to discuss BBF's performance on Contract 2006-0490. They also specifically discussed Charles's performance. Appellants nonetheless allege that BBF undeservedly received these negative evaluations and that these evaluations are indicative of discrimination.

Charles acknowledges that Judnic's team had issues with his not logging his calls and failing to keep files up-to-date, but he counters that Judnic treated him like a child. Charles contends that his level of experience was a boon to BBF when it was submitting RFPs; indeed, he told Foster that BBF would be "done" without the added benefits of his experience during the RFP process. Foster testified that she and Charles had spoken about his retirement in late 2007 or early 2008 and that he had informed her of his plans to retire "shortly after" the July 2008 meeting. On October 1, 2008, Foster emailed Judnic notifying him that Charles would retire on December 17, 2008. Charles contends that his retirement was a result of his being forced out of his job by MDOT employees, particularly Judnic, in an attempt to undercut BBF.

In October 2007, MDOT selected BBF for another as-needed contract at the Detroit TSC, Contract 2008-0044, which was to be managed by Jason Voigt. Voigt contacted Foster to explain that MDOT would be reducing the contract duration from two years to one year. After Foster spoke to Voigt's supervisor, Myron Frierson, however, the contract's duration remained at two years. MDOT awarded BBF the contract on December 11, 2007, and Voigt negotiated the

contract's priced proposal with BBF. Although Judnic was neither the original project engineer nor involved in the discussions about reducing the contract's duration, Appellants contend that Judnic somehow played a part in trying to have the contract's scope reduced.

Before the end of Contract 2008-0044, Voigt left MDOT. In his stead, Judnic—with assistance from another MDOT employee, Steve Griffith—assumed the role of project manager. Because she was displeased with the evaluation of her last contract, Foster requested monthly meetings with Judnic to discuss the progress on this contract. Judnic cannot recall holding such monthly meetings with any other consultant, and Foster was unaware of Judnic's regularly meeting with any other consultant. Regardless, because of his workload, Judnic assigned Griffith to attend the meetings and apprise him of any substantial issues that arose. Foster claims that Judnic simply refused to meet with her, that there must be some reason for this refusal, and that—although she has no evidence to substantiate her suspicion—she believes Judnic's refusal was motivated by her race or gender.

Appellants also contend that Judnic discriminatorily prevented Foster from billing in her capacity as a principal officer for Contracts 2006-0490 and 2008-0044. Although this policy was later changed, at the time of those two contracts, MDOT did not permit a consulting firm's principal officer to bill directly to a project. Based on the policy then in effect, the RFPs for 2006-0490 and 2008-0044 provided that principals and officers were considered an overhead expense and were not to be included in the budgeted hours. Indeed, pursuant to the old policy, BBF's proposal for each of these projects listed Foster in a non-billable position with zero projected billable hours.

Appellants further claim that they suffered at Judnic's hand because Foster had to file a Freedom of Information Act ("FOIA") request to get the subconsultant evaluations for a project

on which BBF was the prime consultant. Foster contends that she had received these evaluations in the past without needing to request them. Foster argues that her needing to file FOIA requests was a symptom of Judnic's discrimination against her, but she admits that she has no evidence that Judnic refused to provide the subconsultant scores because of either her race or gender.

In November 2009, MDOT selected BBF for Contract 2008-0064, for which Tia Klein served as the project manager. Klein requested that one of BBF's employees, Ray Stewart, take a refresher officer-technician training class before working on the contract. Although Stewart normally would not have been required to take the class, Klein explained that she made this request for two reasons: (1) the federal government would be reviewing the project records more closely than usual because the contract used American Recovery and Reinvestment Act ("ARRA") funds; and (2) her review of Stewart's work on another project indicated some deficiencies. Klein and Rita Screws, the Detroit TSC Manager and Judnic's supervisor, were the only two MDOT employees involved in the decision to require additional training for Stewart. Nonetheless, because Judnic was Klein's supervisor, Appellants contend this extra training requirement was a part of Judnic's pattern of discrimination against Foster and BBF.

Appellants also allege that Judnic discriminatorily prevented BBF from being paid as a subconsultant. In 2010, BBF was working as a subconsultant for another consulting firm, URS, on the Gateway Project, for which Judnic was the project manager. BBF was not being paid for the services it rendered, and when Foster explored why, she learned that URS had not been submitting BBF's invoices. In their amended complaint and in their responses to Appellees' motions below, Appellants contended that Judnic discriminatorily played a role in BBF's not being paid because, as the project manager, he reviewed all the invoices that were submitted and he did not question URS about the absence of BBF's invoices. Now, although it is not clear

based on their filings, Appellants seem to contend that Judnic received BBF's invoices and discriminated against Foster by refusing to approve them. Regardless, BBF eventually received full payment for the services it rendered after Judnic and Cedric Dargin, another MDOT engineer, investigated the issue.

In an attempt to reduce vehicle costs, Judnic—with the approval of MDOT and the Office of Commission Audit—introduced a pilot requirement to a 2010 RFP that required the consultant to have a fleet of five leased vehicles. This requirement involved pass-through leases for the vehicles with MDOT ultimately reimbursing the expenses. Any consultant who was interested in the contract had the opportunity to review the requirement and decide whether to submit a proposal for the contract. Because the program received overwhelmingly negative feedback, MDOT did not include the requirement on future projects. Appellants contend that Judnic designed this requirement in an attempt to ensure that contracts only went to large, majority-white engineering consulting firms and to discriminate against BBF specifically because he knew that the company would not be able to lease the necessary vehicles. Appellants underscore this claim by pointing out that Judnic began working for HNTB, the company that was ultimately awarded the contract, after he left MDOT and that Judnic drives a company vehicle.

On June 15, 2010, Foster sent a letter to Tony Kratofil of MDOT regarding Contract 2008-0044. In this letter, Foster expressed concern about MDOT's proposal and evaluation process, particularly in light of the fact that MDOT had rated BBF "the lowest of the entire as-needed services team on two consecutive contracts with the same project manager." Foster explained that she was especially disturbed because she had requested meetings regarding Contract 2008-0044 and had never been told that the management had any major issues. She was concerned because these low scores would influence her future ability to secure work.

### III.     Facts Related to the Allegations Against Stuecher

In 2009, BBF submitted a proposal in response to an RFP for an ARRA-funded project from the Oakland TSC.  Because it was an ARRA project, the proposals underwent a modified selection process.  First, they went to a selection team, comprised of Stuecher, who served as the project manager, and three other MDOT engineers—Cedric Dargin, Mark Koskinen, and Sean Kerley.  The panel would identify the three highest-scoring firms and then move those firms forward for a second round of evaluation.  Near the beginning of the selection meeting, Stuecher temporarily left the room.  The meeting's attendees differ on the details of what happened next.

According to Dargin, while Stuecher was gone, the panel fully scored all of the proposals, and BBF received the highest score.  Dargin claims that when Stuecher returned and saw BBF's score he said, "Oh no, I hate her," and then "unilaterally" reduced BBF's score to prevent BBF from advancing in the selection process.  Even after this alleged unilateral change, Dargin nonetheless signed all of the score sheets.

Stuecher claims that he told the other panel members to start reviewing the proposals in his absence with the understanding that the panel would not commence officially scoring until he returned.  He testified that when he returned to the selection meeting, the work was partially done and there were some "scratched out numbers" but that the panel then evaluated the proposals for close to another hour.  Stuecher claims they completed the score sheets after the panel reached a consensus regarding each proposal.  Stuecher does not remember ever saying, "Oh no, I hate her."

Koskinen's recollection is consistent with Stuecher's.  Koskinen remembers the rest of the panel reviewing the proposals after Stuecher left and the entire panel then engaging in

discussion after Stuecher returned. Koskinen understood that each panel member's signature on the score sheets indicated that the full panel reached a consensus score.

At the end of this process, BBF was not one of the three highest-scoring firms and therefore did not advance to the next round of consideration. Appellants argue that Stuecher had no basis for personal animus against Foster because Stuecher did not know Foster. From this conclusion, Appellants extrapolate that Stuecher's alleged comment and reduction of BBF's score must have been the result of race- or sex-based discrimination.

## IV. The Federal Highway Administration Investigation

In July 2010, BBF submitted a number of complaints to the Federal Highway Administration ("FHWA") claiming that MDOT's administration and contract procedures were discriminatory and retaliatory; BBF filed two additional complaints in February 2011. After investigating, the FHWA sent MDOT a "Report of Inquiry" dated October 18, 2011. The initial Executive Summary of the FHWA's report explains that the agency applied a preponderance of the evidence standard, which it defined as "just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true." The report then summarizes:

> In this inquiry, the preponderance of the evidence showed that an MDOT employee willfully removed BBF Engineering Services P.C. from the top place of a consulting construction award so that Ms. Foster's firm would not be considered.
>
> In addition the evidence shows that based on Ms. Foster's sex (gender) (female) an MDOT employee sent forward her contract to Lansing to have funds removed from it. This resulted in her as-needed service contract being cut in half.
>
> These facts have raised questions in the way service/consulting contracts are awarded at MDOT and the "power" that Project Engineers have in those selections and awards.
>
> It is our belief that MDOT should set up a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process.

- 10 -

It is our belief that MDOT should meet with Ms. Foster in regards to these issues and reaching a settlement agreement that would be acceptable to both parties.

The report goes on to provide more detailed results of the FHWA's inquiry. It first furnishes the results of investigator Cheryl Hudson's interview with Caldwell, Judnic's former secretary. The report states that, according to Caldwell, Judnic was referring to Foster when he said, "No woman should be making money like that," and that Caldwell did not recall if Judnic said "no Black woman." In her deposition, however, Caldwell explained "that's not how the story goes," that she did not know to whom Judnic had directed his statement, and that she did not think that Judnic made any mention of race or national origin.

The report then notes that, in June 2006, Judnic notified BBF that MDOT was cutting Contract 2006-0940 in half and "rebidding" the M-10 portion of the contract. The report stated that MDOT told Mary Finch, an FHWA investigator, that a committee in Lansing made the decision to "unbundle" larger contracts so that MDOT could create a "viable consultant industry." Finch interviewed Judnic, who, according to the report, told her that, "Lansing wants to provide more opportunities for diverse small consultants[.]" Finch documented her asking Judnic whether he had considered that BBF was a DBE and Judnic's responding that he had not. The report further records MDOT awarded the rebid M-10 portion of the contract to Fishbeck, which at the time was the third-largest consultant doing business with MDOT.

From the investigation, the FHWA concluded that the "preponderance of the evidence" indicated that Judnic "appear[ed] to have taken actions based on Ms. Foster sex (gender) (female)." The FHWA saw a connection between Judnic's stating "[n]o woman should make that amount of money," and his later acting in a way that "suggest[ed]" that BBF's contracts "go forward as contracts that could be cut." The FHWA also concluded that the MDOT offices in

- 11 -

Lansing were sending mixed messages about what it wanted to accomplish by re-advertising parts of contracts. The FHWA stated that Judnic "thought he was supposed to be obtaining more diversity in his contracting opportunities and he cho[se] to break out [of] a contract that was already awarded to a DBE," and "[t]he result was that a large white[-]owned firm was awarded the second half of the contract." Judnic, for his part, complained that Finch's questions were vague, that she refused to provide any context or clarification for her questions, and that the FHWA report bolstered its conclusions using only portions of quotations and quotations taken out of context.

Stuecher was not interviewed during the FHWA investigation. The report nonetheless concludes that "MDOT (Mr. Mark Stuecher) willfully changed the scores on the sheet to remove BBF Engineering from the top three . . . It is unclear as to motive." The FHWA requested that MDOT "form a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process."

## V.     MDOT's Audit

During the course of the ensuing litigation, MDOT conducted an audit of BBF. Appellants contend that this audit is retaliation for their filing suit and that the auditing department's exclusive motive was for MDOT to be able to conclude that Appellants were making too much money. MDOT, however, explains that the Office of Commission Audit had planned to audit BBF as a part of its annual audit plan as far back as October 2009, well before Appellants filed suit.

## PROCEDURAL HISTORY

Appellants filed their initial complaint in the United States District Court for the Eastern District of Michigan on November 3, 2011—less than a month after the FHWA issued its

October 18, 2011 report. In this complaint, Appellants alleged that Judnic, Stuecher, the State of Michigan, and MDOT had discriminated and retaliated against them in violation of Title VI, 42 U.S.C. § 2000d; 42 U.S.C. §§ 1981 and 1983; and Michigan's Whistleblower Protection Act ("WPA"), Mich. Comp. Laws § 15.362.

All of the defendants filed Fed. R. Civ. P. 12(b)(6) motions to dismiss for failure to state a claim. The district court granted the State of Michigan's and MDOT's motions to dismiss in full, finding that Title VI did not extend to gender discrimination, that BBF had not stated plausible claims of race-based discrimination or retaliation under Title VI, and that Eleventh Amendment immunity precluded the remainder of the claims against them. The district court likewise dismissed the individual-capacity Title VI claims against Judnic and Stuecher because individuals cannot be held liable under Title VI. The district court rejected Appellants' argument for equitable tolling and concluded that a three-year statute of limitations applied to Appellants' federal claims. Finally, the district court also dismissed the various official-capacity claims against Judnic and Stuecher because either the defendants were immune or the claims were redundant and duplicative. After dismissal of these claims, the only claims that remained were the individual capacity § 1983 and WPA claims against Judnic and Stuecher.

Appellants later moved to amend their complaint to include additional § 1983 claims and to renew their Title VI claims against Michigan and MDOT. The district court granted this motion in part. The district court found that Appellants' new proposed due process claims were futile and denied reinstatement of the Title VI claims. This district court did, however, allow Appellants to add a § 1983 race-discrimination claim under the Fourteenth Amendment's Equal Protection Clause. On reconsideration, the district court again dismissed the equal protection claims against the State of Michigan and MDOT on the grounds of immunity. Instead of those

claims, the district court permitted Appellants to sue Governor Rick Snyder and MDOT Director Kirk Steudle in their official capacities for prospective injunctive relief under § 1983. The record indicates, however, that BBF never served either of these new parties with a complaint or summons.

After discovery, the remaining defendants moved for summary judgment. The district court granted this motion, holding that Appellants lacked evidence that BBF was treated differently from similarly situated consulting firms. The district court dismissed the official-capacity claims for prospective relief because Appellants' constitutional rights were not violated and found four separate bases for dismissing the WPA claims. This appeal ensued.

## ANALYSIS

Distilling their arguments down to a more manageable form, Appellants essentially contend that the district court reversibly erred in a six ways: (1) by dismissing their Title VI claims because they did not plausibly state an allegation of race-based discrimination and because Title VI does not apply to gender discrimination or vicarious liability claims; (2) by finding that MDOT and the State of Michigan were entitled to Eleventh Amendment Immunity from Appellants' § 1983 claims; (3) by granting summary judgment to Snyder and Steudle, in their official capacities, because Appellants failed to produce evidence of an ongoing violation such that prospective injunctive relief would be appropriate; (4) by granting summary judgment on Appellants' § 1983 equal protection claims against Judnic and Stuecher individually because Appellants failed to present facts indicating that Judnic or Stuecher had treated any similarly situated firms differently from BBF; (5) by granting summary judgment to Judnic and Stuecher on Appellants' WPA claims; and (6) by denying Appellants' motion to amend their complaint to

add a due process claim as futile because they failed to identify a constitutionally protected liberty or property interest.

We review all of these claims de novo. *See, e.g.*, *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (stating that we review a district court's grant of summary judgment de novo); *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009) (noting that we review a district court's dismissal de novo); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (explaining that we typically review the denial of a motion to amend for abuse of discretion but that we review de novo a denial on the basis of futility).

## I.    Title VI Claims

Appellants contend that the district court erroneously dismissed their sex- and race-based discrimination and retaliation claims under Title VI.  To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a claim's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted). This assumption that all the complaint's allegations are true does not, however, apply to legal conclusions or to legal conclusions cloaked as fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.  Further still, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A. <u>Gender-based Discrimination under Title VI</u>

Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. As a matter of plain language, Title VI does address discrimination on the basis of sex or gender. *See id.* "[W]hen the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).

Because it does not say anything about sex or gender, the text of 42 U.S.C. § 2000d itself compels us to conclude that Title VI does not provide a cause of action for gender discrimination. Two of our sister circuits have reached the same conclusion. *See, e.g.*, *Shannon v. Lardizzone*, 334 F. App'x 506, 507 n.1 (3d Cir. 2009); *Davis v. Monroe Cnty. Bd. of Educ.*, 120 F.3d 1390, 1396 (11th Cir. 1997), *rev'd on other grounds*, 526 U.S. 629 (1999). Moreover, dicta from Supreme Court cases contrasting Title VI with Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, suggests that Title VI is not applicable to gender discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 297 (2001) (referring to Title IX, which addresses gender discrimination in educational settings, as Title VI's "gender-based twin"); *Gesber v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (stating Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination"); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523 n.13 (1982) (noting that there had been proposed legislation to "extend[] the prohibitions of Title VI . . . to discrimination based on gender . . ." but that this proposal "never emerged [from] the committee").

In the face of this plain language, persuasive authority from our sister circuits, and confirming dicta from the Supreme Court, BBF attempts to read 23 U.S.C. § 324—a wholly

separate statute that addresses gender discrimination in federally funded contracts—in a manner that extends Title VI's coverage to prohibit discrimination based on gender, as well as presumably disability, age, and religion. This reading is unpersuasive because nothing in the text of 23 U.S.C. § 324 suggests that it affects the coverage of Title VI. Further, Appellants cite no, and indeed we have not found any, authority supporting this expansive reading of § 324. Appellants also argue that 42 U.S.C. § 2000d-7 provides a cause of action for a gender-based Title VI claim. Again, this argument is unpersuasive. That statute indicates that Congress intended to abrogate states' sovereign immunity and to provide remedies under Title VI, among other civil-rights statutes. *See Alexander*, 532 U.S. at 280. Section 2000d-7, however, does not affect the substance of Title VI. Because Title VI only applies to discrimination on the basis of race, color, or national origin, the district court properly dismissed Appellants' gender-based Title VI claims.

### B.  Race-based Discrimination under Title VI

Title VI targets intentional discrimination only. *Alexander*, 532 U.S. at 280. Appellants, however, fail to plead any plausible claims of intentional discrimination. Rather, Appellants' Title VI race-discrimination claims consist of nothing more than legal conclusions such as "Plaintiffs have been denied participation based upon race, color, national origin, and gender." These conclusory allegations of race discrimination are insufficient. "[A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief." *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009); *see also Iqbal*, 556 U.S. at 680. Similarly, the Appellants' allegations that Foster belongs to a suspect class and that BBF is owned by a member of a suspect class—

while true—do not state a claim of racially motivated discrimination. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011); *accord Ashcroft*, 556 U.S. at 680.

Even if Appellants had managed to articulate a plausible claim based on the actions of Judnic or Stuecher, which they have not, Appellants likely would not be able to establish Title VI liability for MDOT or the State of Michigan under a theory of respondeat superior. In *Gesber v. Lago Vista Independent School District*, 524 U.S. 274, 290-91 (1998), the Supreme Court held that vicarious liability was not available under Title IX and that a supervisory entity must have had knowledge of and been deliberately indifferent to an employee's discriminatory actions. The *Gesber* court reasoned that Title IX was a conditional statute rather than a prohibitory statute, so primary enforcement rested within the jurisdiction of the funding agency. *Id*. at 286-88. Title VI contains a similar administrative enforcement provision. *Compare* 20 U.S.C. § 1682 *with* 42 U.S.C. § 2000d-1. Beyond this similar language, the *Gesber* court recognized that Title VI and Title IX "operate in the same manner." 524 U.S. at 286. Accordingly, *Gesber*'s interpretation that there is no vicariously liability under Title IX supports the notion that there is no vicarious liability under Title VI. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.10 (2d Cir. 2012).

Appellant's complaint does not contain any fact-based allegations that either MDOT or the State of Michigan participated in, was aware of, or was deliberately indifferent to any discriminatory acts. Because the complaint fails to offer any plausible race-based Title VI claims, the district court properly dismissed them. *See Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570).

C. Title VI Retaliation

The district court reasoned it was implausible that Appellants' filing Title VI complaints was causally related to BBF's struggling to secure contracts given that BBF's difficulties preceded its complaints by several years, and as such, the district court dismissed Appellants' Title VI retaliation claims. Appellants argue that we may infer that any action after the date of the complaints to the FHWA was retaliatory. Appellants, however, fail to offer any allegations in the original complaint to support a retaliation claim. Instead, they recite the law without any application to the facts and then demand reversal. We are well within our rights to determine that Appellants forfeited appellate review of their retaliation claims by only giving this issue a cursory acknowledgment. *E.g.*, *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited").[3]

D. Official-Capacity Claims Under Title VI

A plaintiff may only assert Title VI claims against "the entity . . . receiving the financial assistance." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1357 (6th Cir. 1996); *see also Shannon*, 334 F. App'x at 508. On appeal, Appellants challenge the dismissal of the official capacity suits against Judnic and Stuecher. Official-capacity claims are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Where the entity is named as a defendant, an official-capacity claim is redundant. *E.g.*, *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 327 (6th Cir. 2013) ("Having sued . . . the entity for which [plaintiff] was an agent, the suit against [plaintiff] in his official

---

[3] Because Appellants did not claim that MDOT's audit of BBF was retaliatory in the district court, we need not rule on this claim. *See Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) ("Ordinarily, we will not address issues raised for the first time on appeal.") (citing *McFarland v. Henderson,* 307 F.3d 402, 407 (6th Cir. 2002)). Nonetheless, we note that even if the issue were properly before us, we would find that Appellants still failed to allege a plausible retaliation claim and thus that this claim was properly dismissed.

capacity was superfluous."). Here, because Appellants named MDOT and the State of Michigan as defendants, their official-capacity suits against Judnic and Stuecher are superfluous. Because the Title VI claims against the State and MDOT fail, Appellants' official-capacity claims against Judnic and Stuecher necessarily also fail. *See Jackson v. Wilkins*, 517 F. App'x 311, 321 (6th Cir. 2013); *Chesher v. Neyer*, 477 F.3d 784, 797 (6th Cir. 2007).

## II.       42 U.S.C. § 1983 Claims

42 U.S.C. § 1983 provides a civil cause of action for plaintiffs who have been deprived of rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . . Injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable . . . .

Appellants brought claims under § 1983—as well as 42 U.S.C. § 1981[4]—against Judnic and Stuecher, both in their official capacities and individually; the State of Michigan; MDOT; and eventually Snyder, in his official capacity as Governor, and Steudle, in his official capacity as the director of MDOT, all of which were resolved in favor of the Appellees either on motions to dismiss or motions for summary judgment. On appeal, Appellants attempt to revive all of these claims.

Although Appellants did not bring a claim under a mixed motive theory below, they now contend that "at best, this is a mixed motive case." We decline to consider this argument.

---

[4] Although Appellants attempted to bring their § 1981 claims as independent actions, 42 U.S.C. § 1981 does not contain a private remedy. Rather, it is essentially part and parcel of Appellants' 1983 claim. *See Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011) (stating that a § 1981 claim is analyzed using the same framework as a § 1983 discrimination claim); *McCormick v. Miami Univ.*, 693 F.3d 654, 660-61 (6th Cir. 2010) (explaining that § 1981 is enforced through § 1983).

"Plaintiffs must give proper notice when bringing mixed-motive claims." *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010). Because Appellants did not give proper notice or make a mixed-motive argument below, they have forfeited this theory on appeal. *See, e.g.*, *Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 617 (6th Cir. 2010); *Hashem-Younes v. Danou Enters., Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009).

After seemingly casting BBF as in a "class of one" in their opening brief, Appellants now deny characterizing themselves as a "class of one." Accordingly, the question that remains before us is whether Appellants raise a genuine issue of material fact indicating that any of the Appellees intentionally discriminated against them on the basis on race or gender in violation of the Equal Protection Clause of the Fourteenth Amendment. *E.g. Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 267 (6th Cir. 1994) ("The Equal Protection Clause forbids only intentional discrimination.").

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (citations omitted). "[T]o establish an equal protection violation against a public employer in a section 1983 action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" *Boger v. Wayne Cnty.*, 950 F.2d 316, 324-25 (6th Cir. 1991) (quoting *Charles v. Baesler,* 910 F.2d 1349, 1356-57 (6th Cir.1990)). A plaintiff in a § 1983 equal protection case must demonstrate that the adverse employment decision would not have occurred but for her protected status. *Id.* at 325. A plaintiff "must do more than just introduce evidence of discriminatory intent and suggest that 'such intent could have played a role in an adverse

employment decision . . . .'" *Id.* (quoting *Gutzwiller v. Fenick*, 860 F.2d 1317, 1325 (6th Cir. 1988)). As a black woman, Foster is a member of a protected class for both race and gender. *See Oliver v. St. Luke's Dialysis LLC*, 491 F. App'x 586, 587 (6th Cir. 2012) (citations omitted). At this stage, she must point to evidence that Appellees took adverse actions against her because she was a member of a protected class.

A. Section 1983 Claims against the State of Michigan and MDOT

The district court dismissed Appellants' § 1983 claims against the State and MDOT on the basis of the Supreme Court's holding in *Will v. Michigan Department of State Police*, 491 U.S. 58, 67, 71 (1989), that the Eleventh Amendment bars suits against states and state agencies unless a state has waived its immunity or consented to being sued in federal court. Appellants contend that the district court erred in dismissing their § 1983 claims, as well as their attempted direct constitutional claims, against these entities.

To the extent that Appellants attempt to assert direct constitutional claims, they fail; we have long held that § 1983 provides the exclusive remedy for constitutional violations. *Thomas v. Shipka*, 818 F.2d 496, 503 (6th Cir. 1987), *vacated on other grounds*, 488 U.S. 1036 (1989); *accord Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) ("[A] litigant complaining of a constitutional right must utilize 42 U.S.C. § 1983."). Appellants' § 1983 claims likewise fail. Section 1983 did not abrogate the sovereign immunity of either the State of Michigan or MDOT. *Quern v. Jordan*, 440 U.S. 332, 345 (1979). Furthermore, neither the State nor MDOT qualify as "persons" under § 1983. *Will*, 491 U.S. at 71. The district court did not err in dismissing the § 1983 claims against MDOT and the State of Michigan.

B.  Section 1983 Claims Against Snyder and Steudle in their Official Capacities

After dismissing the § 1983 claims against the State of Michigan and MDOT for a second time, the district court permitted Appellants to substitute Governor Snyder and Director Steudle in their official capacities and to seek prospective injunctive relief against them under *Ex Parte Young*, 209 U.S. 123 (1908).  The record does not indicate, however, that Appellants ever served summons on complaints on Snyder or Steudle.  Appellants contend that they have constructively served Snyder and Steudle because the Office of the Michigan Attorney General represents all of the defendants.  We look askance at this argument.  Even presuming that Snyder and Steudle had been properly served, the district court did not err in granting summary judgment on these official-capacity claims.  Dismissing the claims against all of the individual defendants necessarily defeats the official-capacity claims against Snyder and Steudle.  *See Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) (explaining that dismissal of all the individual claims a fortiori defeats the claims against the entity) (citations omitted).  Even if this were not so, Appellants cannot sustain their § 1983 claims against Snyder and Steudle based on a theory of supervisory liability.  *See Moniz v. Cox*, 512 F. App'x 495, 499 (6th Cir. 2013) ("General allegations of Cox's failure to supervise and investigate are insufficient to state a claim[.]").

Appellants also fail to indicate how prospective injunctive relief would be appropriate in this case.  They have not identified any remediable ongoing violations of law beyond conclusory statements that prospective injunctive relief would be appropriate.  *See Terrance v. Northville Reg. Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002) (stating that "violations of constitutional rights cannot be founded upon conclusory, vague or general allegations").  Appellants' inability to point to an impending wrongdoing undercuts their claims against Snyder and Steudle.  *See Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (stating that injunctive relief is not justified where

"there is no showing of any real or immediate threat that the plaintiff will be wronged again").

Similarly, Appellants fail to explain how prospective relief would remedy any of its alleged

injuries beyond speculating that BBF would receive more contracts in the future once MDOT's

selection process were changed. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)

(explaining that a plaintiff must indicate that it is "likely"—as opposed to "merely

speculative"—that a favorable decision would redress plaintiff's injury in order to have

standing). The district court did not err in granting summary judgment on the official-capacity

claims against Snyder and Steudle.

C. Section 1983 Claims Against Judnic

A plaintiff may prove a claim of intentional discrimination using either direct or

circumstantial evidence. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d

921, 926 (6th Cir. 1999). The district court concluded that Appellants could not prove that

Judnic violated their equal protection rights using either direct or circumstantial evidence; on

appeal, Appellants contend that they have sufficiently pointed to enough both direct or

circumstantial evidence to sustain their § 1983 claim against Judnic.

As a preliminary matter, we note that many of Appellants' purported pieces of evidence

fall after the limitations date—November 3, 2008—that the district court imposed when it

rejected Appellants' request for equitable tolling. Because Appellants did not challenge this

holding in their brief, we consider it waived. *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444,

462 (6th Cir. 2003) ("An appellant waives an issue when he fails to present it in his initial briefs

before this court."). Based on this limitations period, several pieces of evidence from

Appellants' complaints below and their briefs here are untimely—including the scope and billing

of Contract 2006-0490, which was awarded September 25, 2006; the scope and billing of

Contract 2008-0044, which was awarded December 11, 2007; and Charles's retirement, which was announced on October 1, 2008. Still, even considering all of this untimely evidence, Appellants' § 1983 claims against Judnic fail.

### 1. *Direct Evidence of Judnic's Discrimination*

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn*, 176 F.3d at 926. Direct evidence "does not require a factfinder to draw any inferences." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Appellants contend that Judnic's saying "no woman should be making that kind of money" amounts to direct evidence of sex-based discrimination. This argument has several fatal defects. First, this statement was isolated and ambiguous—particularly given Caldwell's inability to recall its details. As such, it does not constitute direct evidence of discrimination. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993). Nothing in the statement indicates that it was made regarding Foster or BBF. *See Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) ("The fact that the statements do not specifically mention [plaintiff] means only that they are not direct evidence of discrimination . . . .").

Also, Judnic did not make this statement in the context of an evaluation or other adverse employment action. "Statements by decision makers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)) (internal quotation marks and alterations omitted). If comments suggesting animus were present, we then would consider whether Judnic took an adverse action "because of [his] predisposition to discriminate" against a protected class.

*DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004). Given that—even in Caldwell's fuzzy recollection—this statement was singular, there is no evidence in the record that Judnic harbored animus. *Compare Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 661 (6th Cir. 1999) (finding that a single slur was not direct evidence of discrimination) *with Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1249 n.2 (6th Cir. 1995) ("[T]he repeated usage of racial slurs in this case cannot be termed isolated or abstract.").

Finally, the timing of the statement—sometime in 2006 and thus roughly three years before the evaluation and two years before a timely claim could have accrued—undercuts finding that it is direct evidence. *See Hein v. All Am. Plywood Co., Inc.*, 232 F.3d 482, 489 (6th Cir. 2000) (explaining that comments made five months before an employee's termination were too far removed to be direct evidence); *Phelps*, 986 F.2d at 1026 (stating that comments made "nearly a year" before an adverse action "were made too long before . . . to have influenced the . . . decision"); *but see DiCarlo*, 358 F.3d at 416 (holding that racial slurs made three weeks before termination constituted direct evidence). The district court did not err in concluding that Appellants' failed to point to direct evidence of Judnic's discrimination.

### 2. *Circumstantial Evidence of Judnic's Discrimination*

To make a prima facie case of discrimination under § 1983, Appellants must sufficiently indicate that Judnic took an adverse action against them. *See*, *e.g.*, *Rushton v. City of Warren*, 90 F. App'x 912, 916 (6th Cir. 2004); *Policastro v. N.W. Airlines, Inc.*, 297 F.3d 535, 539 n.1 (6th Cir. 2002). An adverse action is "a materially adverse change in the terms and conditions" of Appellants' work; examples include "termination of employment, a demotion . . . a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atl. Co., Inc.*, 188 F.3d

652, 662 (6th Cir. 1999). *De minimis* actions are not materially adverse. As we explained fifteen years ago, if every action that made an employee "unhappy or resentful" was materially adverse, then supervisors could be liable for "criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 766 (6th Cir. 1999); *accord Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) ("Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."). Appellants' circumstantial evidence of discrimination fails to indicate that Judnic was "personally involved in the alleged misconduct." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).

For example, in 2010 when BBF was not being paid for its work as a subconsultant on the Gateway Project, Appellants do not dispute that the delay in payment was because URS—the prime consultant—initially failed to submit BBF's invoices to Judnic. Appellant's point to this temporary nonpayment as an adverse action, contending that Judnic neglected to investigate this issue promptly or thoroughly. This argument is flawed for several reasons. First, this allegation appears to be less of a claim of intentional discrimination and more of a claim sounding in negligence. Second, this claim appears indistinguishable from *Rasins Landscape & Assocs., Inc. v. MDOT*, 528 F. App'x 441 (6th Cir. 2013), where we held that an MDOT subcontractor lacked standing to bring a claim against MDOT for a prime contractor's failure to pay contract proceeds. *Id.* at 444-45.

Appellants' other aspects of circumstantial evidence fail to indicate that Judnic took a materially adverse action against them. Many of Appellants' other pieces of evidence— including having to submit a FOIA request to see subconsultant evaluations, Judnic's holding a telephonic meeting instead of an in-person one, and Judnic's having another engineer meet with

Foster—fall into the category of *de minimis* actions that are not materially adverse. *See Primes*, 190 F.3d at 766. Further, Appellants contend that Judnic took a materially adverse action by requiring extra training for Stewart. Unrefuted evidence in the record, however, indicates that Judnic had no hand in this requirement. Appellants also contend that Judnic took a materially adverse action against them by inserting the leased-vehicle requirement into an RFP in 2010. This requirement, however, was not materially adverse because it applied across-the-board to any consultant who wished to submit a proposal for the project.

Appellants' strongest adverse action argument is Judnic's giving BBF two "7 out of 10" scores in his evaluation of BBF's performance on Contract 2006-0490. Indeed, the district court found that this evaluation was materially adverse. To reach this conclusion, the district court relied on our decision in *Blizzard v. Marion Technical College*, 698 F.3d 275, 290 (6th Cir. 2012), which in turn relies on the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), to apply a "reasonable worker" standard—that an adverse action is material if it would dissuade a reasonable worker from making or supporting a charge of discrimination.

Appellees, however, contend that the district court relied on the incorrect definition of "adverse action." They assert that *Burlington Northern* established the reasonable worker standard for retaliation but did not relax the standard for disparate-treatment. We agree; although *Burlington Northern* certainly expanded the definition of adverse employment action for the purposes of retaliation, it left the term undisturbed in the discrimination context. *See Tepper v. Potter*, 505 F.3d 508, 515 n.1 (6th Cir. 2007) (explaining that *Burlington Northern* expanded the definition of "adverse employment action for a Title VII retaliation claim" but that "*Burlington Northern* did not expand or alter this Court's formulation of an adverse employment

action for purposes of the discrimination claim before us" (internal citations and quotation marks omitted)); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (emphasizing the distinction between a prima facie discrimination claim and a prima facie retaliation claim).

For a disparate-treatment discrimination claim, a "mid-range, performance evaluation of 'fully successful'" is not an adverse action sufficient to withstand summary judgment. *Primes*, 190 F.3d at 766; *see also James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007) (noting that an adverse evaluation did not constitute a materially adverse action before *Burlington Northern*). Judnic's assigning BBF two scores of seven on a one-to-ten scale appears decidedly mid-range. But even if this evaluation did indicate that BBF had not been fully successful, Appellants would still need to indicate that they "suffered, or [are] in jeopardy of suffering," a concrete action "because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000). Unless this negative evaluation had palpable negative effects, it is not actionable. *See Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 348 (6th Cir. 2008); *Morris*, 201 F.3d at 789; *cf. White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008) ("By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled.").

Appellants fail to identify any contracts that BBF and Foster were not awarded as a result of either the evaluation for Contract 2006-0490 or Judnic's conduct generally. Foster does offer some highly speculative testimony claiming that BBF was not awarded contracts because of Judnic's actions, but a plaintiff's subjective beliefs are "wholly insufficient evidence to establish a claim of discrimination." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992); *see also Shaheen v. Naughton,* 222 F. App'x 11, 13-14 (2d Cir. 2007) (affirming summary judgment

where a plaintiff "merely speculates that her failure to secure another residency must have been a result of negative evaluations"). Rather, Appellants acknowledge that BBF struggled to obtain work before Judnic's evaluation and, conversely, that a panel chaired by Judnic selected BBF for a contract after this evaluation. Additionally, "Past Performance" ratings on BBF's pre- and post-evaluation proposals remained largely consistent.

Because Appellants do not offer evidence that Judnic's evaluation either was noticeably worse than prior evaluations or that it meaningfully affected BBF's ability to secure future work, this evaluation does not constitute a materially adverse action. Because Appellants do not sufficiently assert that Judnic took a materially adverse action against them, their disparate-treatment-based equal protection claim against Judnic fails.[5]

D. Section 1983 claims against Stuecher

Appellants do not appear to challenge the district court's holding that Stuecher's alleged statement—"I hate her"—was not direct evidence of either race or gender discrimination. We therefore only analyze whether the district court erroneously concluded that Appellants did not put forth a prima facie § 1983 disparate-treatment claim using circumstantial evidence. As this claim was resolved at the summary judgment stage, we must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, although the record is conflicted regarding whether Stuecher unilaterally changed BBF's evaluation scores during the selection process for the 2009 ARRA contract, we assume that he did at this stage. This modification of BBF's scores such that BBF did not progress to the second round of evaluation constitutes a materially adverse action.

---

[5] Based on this holding, we need not examine whether Appellants can point to evidence that Judnic treated any similarly situated consulting firms differently. Nonetheless, we note that Appellants are unable to do so for the reasons explained below in the next section, addressing whether Appellants can identify any similarly situated consulting firms that Stuecher treated differently.

To prevail on their § 1983 disparate treatment claim, however, Appellants must also indicate that Stuecher treated BBF differently from other similarly situated consulting firms.

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A prima facie case of discrimination requires a plaintiff to show that she was treated differently than others outside of the protected class. *See, e.g.*, *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). "[T]o be deemed 'similarly-situated', the [firms] with [which] the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Appellants "need not demonstrate an exact correlation," but their comparators "must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

The district court found that Appellants had, at best, identified three alleged comparators—Wade Trim Associates, HNTB, and Great Lakes Engineering—but that Appellants did not provide any factual bases to support a finding that these firms were similarly situated. Appellants now claim both that there are no firms comparable to BBF and that all the "majority" consulting firms—HNTB; Fishbeck, Thompson, Carr & Huber; Great Lakes Engineering; URS Corporation; and Wade Trim Associates—are similarly situated. Moving beyond the inconsistency of this argument, because Appellants did not assert that all of these

firms were similarly situated in the district court, we need not consider these new arguments. *See Coach*, 717 F.3d at 502.

We nevertheless note that Appellants have not presented sufficient evidence to indicate that any of these firms are similarly situated. To have a sufficient comparator, Appellants need to identify a nonprotected firm that "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [its] conduct or the employer's treatment of them for it" and was "subject to the same standards." *Mitchell*, 964 F.2d at 577. Appellants offer no evidence regarding the experience, qualifications, or size of these supposedly similarly situated firms beyond conclusory statements that the firms were similarly situated.

Indeed, of all the firms that Appellants attempt to use as comparators, only two—HNTB and URS—submitted proposals for the 2009 ARRA contract. Although HNTB was more highly scored than BBF and did ultimately receive the contract, the record does not support Appellant's contention that BBF and HNTB are similarly situated with regard to the 2009 ARRA contract. Turning to URS, even if it were similarly situated (and nothing in the record indicates that it is), it still would not make for an apt comparator because URS actually received lower scores than BBF.

In sum, Appellants have not satisfied the similarly-situated element for a prima facie case of § 1983 discrimination. They have not offered evidence that Great Lakes, HNTB, Wade Trim, or any other "majority" firm dealt with the same supervisors, offered substantially similar proposals to MDOT, had substantially similar employee teams, or had substantially similar evaluations and scores as they were going into the 2009 ARRA evaluation process. Accordingly, Appellants have not satisfied the elements of a prima facie case, and the district court properly granted summary judgment to Stuecher on this claim.

E. <u>Due Process Claims under § 1983</u>

The district court denied Appellants leave to add a § 1983 due process claim regarding Judnic's "low" evaluation to their amended complaint. The district court found that this amendment would be futile because BBF did not have a constitutionally protected liberty or property interest in an evaluation or a protected interest in MDOT's contracting procedures. Giving Appellants every benefit of the doubt, they appear to challenge this ruling on appeal by claiming that BBF was entitled to contracts which were awarded and then wrested away. This cursory argument does not identify any specific contracts that were "wrested away." Based on our best guess, Appellants are referring to the M-10 portion of Contract 2006-0490 that was split away and awarded to another firm. If so, that claim would fail because BBF could not have had a property interest in the contract since it was not yet "actually awarded" when its scope was reduced. *See United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992); *see also* 40 U.S.C. § 1104(b). Moreover, this claim from 2006 would fall outside of § 1983's three-year statute of limitations. Accordingly, the district court properly concluded that this claim would be futile.

## III. Claims under the Michigan Whistleblower Protection Act

The district court found four independent grounds on which to grant summary judgment on Appellants' individual-capacity WPA claims against Judnic and Stuecher: (1) BBF and Foster were not "employees" of MDOT; (2) Appellants did not identify an adverse action taken within the WPA's ninety-day statute of limitations; (3) Appellants failed to identify any adverse actions taken after Foster engaged in a protected activity; and (4) Appellants did not identify any adverse actions Judnic or Stuecher took after they knew the protected activity. Appellants challenge all of these findings and assert that factual issues preclude summary judgment.

We analyze claims under Michigan's WPA using the burden-shifting framework for retaliatory discharge claims under the Elliot Larsen Civil Rights Act. *See Taylor v. Modern Eng'g, Inc.*, 653 N.W.2d 625, 628 (Mich. Ct. App. 2002); *accord Pethers v. Metro Lift Propane*, No. 09-CV-10516, 2010 WL 3023887, at *6 (E.D. Mich., July 29, 2010). Under this framework, a plaintiff first must establish a prima facie case under the WPA. *E.g.*, *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471-72 (Mich. 2003). Once a plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its adverse employment action. *E.g.*, *Roulston v. Tendercare (Michigan), Inc.,* 608 N.W.2d 525, 530 (Mich. Ct. App. 2000). If the defendant proffers a legitimate, nonretaliatory reason, the plaintiff then has the opportunity to prove that the defendant's purported legitimate reason was merely pretext for the discharge. *Taylor*, 653 N.W.2d at 628 (citing *Roulston*, 608 N.W.2d at 530).

To make a prima facie WPA case, Appellants must show: (1) that they were engaged in a protected activity under the WPA; (2) that they suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *West*, 665 N.W.2d at 471-72. Assuming for the sake of argument that Foster and BBF were MDOT employees, Appellants have nonetheless failed to assert a prima facie WPA case against Judnic or Stuecher. Foster's filing complaints with the FHWA satisfies the protected activity prong of a prima facie WPA case. Appellants, however, stumble at the second and third prongs. The WPA has a ninety-day statute of limitations. Mich. Comp. Laws § 15.363(1). Although they claim that there are questions of fact regarding this statute of limitations, Appellants do not identify any adverse actions that Judnic or Stuecher allegedly took after Foster first filed her complaints in June 2010. Accordingly, the district court properly concluded that Appellants have not

sufficiently alleged a causal connection between any adverse actions by Judnic and Stuecher and Foster's filing Title VI complaints with the FHWA.

Appellants also challenge the district court's dismissal of their WPA claims against MDOT, the State of Michigan, and Judnic and Stuecher in their official capacities. Appellants acknowledge that the Eleventh Amendment bars suits for damages against a state in federal court but then argue, "However, this does not preclude non-equitable relief. Plaintiffs may proceed against the State and its agencies with their WPA claims." This statement is both befuddling and flatly wrong; under the Eleventh Amendment, "the States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature." *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005). The district court properly dismissed these claims.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Appellants' claims.