**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0505n.06

Case No. 16-1034

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 29, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SONYA BRADLEY, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| STEVE ARWOOD, et al., | ) | MICHIGAN |
| | ) | |
| Defendants, | ) | |
| SUSAN PRZEKOP-SHAW | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GRIFFIN, WHITE, and DONALD, Circuit Judges

BERNICE BOUIE DONALD, Circuit Judge

I.

This appeal arises out of a 42 U.S.C. § 1983 race-based hostile work environment claim brought against current and former employees of the Michigan Department of the Attorney General. The Plaintiff-Appellee, Sonya Bradley, who is African American, initially brought suit against Steve Arwood, William Schuette, Susan Przekop-Shaw, Peter Kotula, and Frank Russell on June 12, 2014, raising claims including the one currently before this Court. On Defendants' Motion to Dismiss, the district court dismissed all of Bradley's claims except her hostile-work-environment claims against Przekop-Shaw and Kotula. Bradley thereafter filed an amended complaint adding Debbie Taylor as an additional defendant. After discovery, the remaining

defendants, including Przekop-Shaw, filed a Motion for Summary Judgment. The district court granted the motion with respect to Kotula and Taylor, but denied the motion with respect to Przekop-Shaw, finding that Bradley presented sufficient evidence to raise a genuine dispute of material fact as to whether Przekop-Shaw had created a race-based hostile work environment. Przekop-Shaw interlocutorily appeals the district court's order denying her qualified immunity. For the reasons set forth herein, we affirm.

## II.

Viewing the record evidence in the light most favorable to Bradley, the facts of this case are as follows. As of 2010, Plaintiff Bradley worked as a legal secretary at the Michigan Department of the Attorney General in the unit handling revenue and collections issues in Detroit. (R. 43-2, ID 465). In January 2011, she was hired as a division legal secretary supervisor overseeing the Unemployment Unit of the Attorney General's office. (R.43-2, 465-66). Bradley technically worked for the Department of Licensing and Regulatory Affairs (LARA), but was detailed back to the Attorney General's Detroit office. (*Id.* at 665–66). Bradley supervised five legal secretaries in the Detroit office, all African-American, and a sixth secretary, who was white, in the Unemployment Unit in the Grand Rapids office. (R. 43-2, ID 466; R. 45-4, ID 666).

In February 2011, Bradley met with her then supervisor, Donna Welch, and Przekop-Shaw, who was Welch's supervisor at the time, in order to discuss Bradley's annual objectives. (R. 45-4, ID 666). During the meeting, Bradley's first assignment was discussed—converting all of the Detroit office Unemployment Insurance Agency (UIA) files, several thousand of them, from a manual system to a computerized system. In response to Bradley's request for additional secretarial staffing to complete the task, Przekop-Shaw suggested bringing on Michael Lockman,

a Caucasian male attorney, who had previously worked at the Michigan Attorney General's office, as had both Bradley and Przekop-Shaw. (R. 46-5 753). Lockman had allegedly racially harassed Bradley in 2010. In fact, Bradley averred in her affidavit that she applied for the position in the Unemployment Unit after Lockman yelled to her "bring your black ass back in here" as she was leaving work one day. (R. 45-4, ID 665).[1] Bradley asserts that Przekop-Shaw knew of Lockman's harassment and used the possibility of moving Lockman into the Unemployment Unit to harass and intimidate her. Bradley alleges that Przekop-Shaw reissued the threat to hire Lockman after Bradley reported to LARA officials in October 2011 that a government-issued credit card assigned to her had been inappropriately used by an employee in the Attorney General's office. (R. 45-4, ID 666–67).

In June 2012, Przekop-Shaw replaced Welch as Bradley's direct supervisor. (R. 43-6, ID 511-12). In September, Przekop-Shaw sent an email to human resources official Frank Russell seeking advice on reclassifying Bradley's position to a lower grade. (R. 45-6, ID 684–85.) It does not appear from the record that any change was made. However, Bradley acknowledges the job posting for the position at issue may have erroneously assigned a higher classification level than the position was actually due. (R. 43-2, ID 466). Erroneously or not, the position conferred a "level 11" classification, the same as Amy Gonea, a Caucasian woman who was the head secretary of the Attorney General's Labor Division office in Lansing. (*Id.*; R. 43-6, ID 517; R. 45-7, ID 687). Bradley claims that in spite of their equal classification, Przekop-Shaw treated Gonea more favorably than Bradley, improperly allowing Gonea to supervise Bradley.

---

[1] At oral argument, Bradley's counsel stated that the employee who reviewed Lockman's alleged racist statement was a subordinate of Przekop-Shaw. There is nothing in the record to support this assertion. It is also unclear whether Bradley's EEOC charges included the Lockman incident. Although Bradley was questioned about her EEOC charges at her deposition, (*e.g.*, R. 43-2, ID 474), neither party submitted the EEOC charges to the district court.

This issue came to a head in the wake of a second incident related to Bradley's government-issued credit card. In November 2012, Gonea asked for Bradley's card information in order to set the card up for the entire Unemployment Unit to use for e-filing charges and purchases. (R. 45-4, ID 668; R. 45-7, ID 689). Bradley contacted a LARA purchasing manager and the Department of Technology, Management, and Budget, who advised her not to provide the credit card information to Gonea and instead follow a LARA procurement policy. (R. 45-4, ID 668; R. 45-7, ID 688–89.) This upset Przekop-Shaw, who in a strongly worded email, admonished Bradley that Bradley's actions were "unacceptable" and accused her of intentionally circumventing and undermining her supervisors in the Attorney General's office. (R. 45-4, ID 668; R. 45-7, ID 687–88.) Przekop-Shaw forwarded this email to Frank Russell, a human-resources official, who stated that a Formal Counseling Memorandum would have been appropriate in this situation. (R. 45-7, ID 687). But Russell went on to state that he believed that Bradley acted in this manner because she was upset at "having to abide by a peer's ([Gonea's]) direction. Regardless of whether she is classified properly or not, 'currently,' she is the same level (I think)." (*Id.*)

According to Bradley, Przekop-Shaw also made her "jump through hoops" to take leave, and would "bombard" her with assignments if she requested time off. (R. 43-2, ID 472; R. 45-4, ID 667.) Bradley testified that, on one occasion, she asked for a day off so that she could take her mother to a medical appointment. (R. 43-2, ID 472, 478.) Przekop-Shaw reluctantly approved the request. (*Id.* at 472, 478.) Then, despite Bradley's leave having been scheduled two weeks in advance, Gonea called Bradley at the very end of the workday prior to her scheduled day off and ordered her to complete a "whole list" of tasks. (*Id.* at 478.) Bradley had to stay several hours late to do so. (*Id.* at 474.) Further, when Bradley was on extended medical

leave in 2013, Przekop-Shaw "harass[ed] [Bradley] via telephone and email requesting [her] to perform [work] duties" from home. (R. 45-4, ID 668–69.) In accordance with medical advice, Bradley refused to do so. (*See id*. at 669.)

Meanwhile, as early as February 2011, Bradley's supervisors instituted regular meetings and communications with Bradley related to her performance. (R. 43-6, ID 514-15). Przekop-Shaw states that these were set up to improve Bradley's performance, which had been noted as problematic since her initial performance evaluation by Welch. (*Id*.) Bradley asserts that these meetings were attempts to embarrass and ridicule her in front of her colleagues. (Appellee's Br. at 7.) Bradley also asserts that Przekop-Shaw imposed unreasonable demands and set unrealistic deadlines all while refusing Bradley's request for additional staffing just to ensure that Bradley would not be successful. (*Id.*)

Bradley's performance evaluations present a conflicting picture. During Bradley's first performance appraisal in March 2012, Welch, her initial supervisor, reported that Bradley "meets expectations." (R. 43-5, ID 502-07). However, in an email dated January 10, 2013, Welch noted that Bradley had begun to engage in negative behavior as early as 2011. (R. 43-4, ID 501). Also in January 2013, Przekop-Shaw reported in Bradley's annual review that overall Bradley "meets expectations," but added that Bradley was having some negative performance issues. (R. 43-6, ID 513; R. 43-7, ID 524-35). Bradley alleges that these comments were insulting and belittling, and were further evidence of harassment (Appellee Br. 7-8); however, Przekop-Shaw asserts that they were specifically related to Bradley's performance problems. (Appellant Br. 9-10; R. 43-7, ID 524-35). Bradley asserts that even as Przekop-Shaw criticized Bradley for not effectively managing her time, prioritizing her tasks, or timely accomplishing tasks, Przekop-Shaw denied

requests for additional staffing or assistance for the all-black Detroit secretarial staff. (Appellee Br. 8).

In September 2013, after determining that Bradley failed to improve, Przekop-Shaw provided her with additional performance objectives. (R. 43-2, ID 481). Bradley highlights this as further harassment, pointing out that her weekly requests for assistance had been ignored. (Appellee's Br. at 8.) One month later, in October 2013, Bradley gave a presentation to the entire Labor Division staff. (R. 43-6, ID 517-18). Although Bradley claims it was well-received, (Appellee's Br. at 9), Przekop-Shaw stated that the presentation, though intended to foster team building, fostered division as it did not recognize the work of a secretary in the Grand Rapids office or anyone outside of Detroit. (R. 43-8, ID 537-38). Bradley responds to this claim by explaining that the secretaries on her team were the subject of her presentation and that the Grand Rapids secretary no longer worked under her. (Appellee Br. 9-10). In a Notice of Formal Counseling issued in response to the presentation, Przekop-Shaw also claimed that Bradley inappropriately complained during the presentation about her workload and pressured others to help her perform her tasks so that they would be considered team players. (*Id.*)

In February 2014, Bradley received a "needs improvement rating" during her annual review, which noted that Bradley had failed to meet the performance objectives issued over the past year. (R.43-6, ID 521; R. 43-9, ID 541). As a result, Bradley was placed on a Performance Improvement Plan, overseen by Bradley's new direct supervisor Peter Kotula, a white attorney who was based in the Detroit office. (R. 43-6, ID 521; R. 43-11, ID 559-60; R. 43-12, ID 562-63). In response to these actions, Bradley filed a grievance and an Equal Employment Opportunity complaint based on racial discrimination and harassment. (Appellee Br. 10). In April 2014, citing a lack of improvement, Kotula issued Bradley a second Notice of Formal

Counseling. (R.43-11, ID 560; R. 43-13, ID 565-66). In September 2014, Kotula gave Bradley an interim rating of "Unsatisfactory" and advised her that she would be terminated if her performance did not improve in accordance with her Performance Improvement Plan. (R. 43-14, ID 568-69). In November 2014, Bradley was also issued two written counseling memos, citing her lack of improvement. (R. 43-15, ID 571-72; R. 43-16, ID 574-75). At the same time that she received these counseling memos, Bradley also received an unsatisfactory interim rating in her follow-up review, which noted that Bradley was still failing to meet performance objectives. (R. 43-18, ID 583-86). Bradley received a third written counseling on December 4, 2014. (R. 43-17, ID 577-81). As a result of continued lack of improvement, Kotula again rated Bradley's performance as "Unsatisfactory" and extended her review period through March 2015. (R. 43-19, ID 588-90).

In February 2015, Bradley received her fourth and final written counseling memo as well as another unsatisfactory progress review from Kotula. (R. 43-20, ID 592-94; R. 43-21, ID 596-604). Bradley claims to have received the fourth counseling memo for seeking help from Kotula to interpret a directive (Appellee Br. 12), but Kotula characterized Bradley's conduct as "accusatory" and "unprofessional." (R. 43-20, ID 592-94). As a result of her failure to meet the objectives established in her Performance Improvement Plan issued in spring 2014, Bradley's employment was terminated effective March 19, 2015. (R. 43-22, ID 606).

III.

Bradley filed this action in June 2014, alleging violations of the First and Fourteenth Amendments, The Civil Rights Act of 1871, and Title VII, along with various state-law claims. (R. 1, ID 1-35). In October 2014, the district court dismissed all but two of Bradley's claims, allowing her hostile-work-environment claims against Defendants Przekop-Shaw and Kotula to

proceed. (R. 14, ID 229-34). In May 2015, Bradley added a claim of racial harassment against Debbie Taylor. (R. 31, ID 326-48). In December 2015, the district court granted summary judgment in favor of Defendants Kotula and Taylor, but denied summary judgment as to Defendant Przekop-Shaw, finding that "Plaintiff has provided evidence to support the allegations made in the complaint with regard to" her hostile-work-environment claim against Przekop-Shaw. (R. 50, ID 821). Przekop-Shaw timely filed this interlocutory appeal, arguing that because Bradley presented insufficient evidence to raise a genuine issue of material fact supporting her claim that Przekop-Shaw engaged in race-based conduct that was severe and pervasive, the district court improperly declined to extend qualified immunity.

IV.

28 U.S.C. § 1291 provides this Court with jurisdiction to hear appeals from "final decisions" of the district courts. However, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). A defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 333 (6th Cir. 2010) (quoting *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)). "[T]he defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998). This Court has held that "[w]hen the legal arguments advanced rely entirely on a defendant's own disputed version of the facts, the appeal boils down to issues of fact and credibility

determinations that we cannot make." *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011) (citing *Berryman*, 150 F.3d at 564).

However, "*regardless of the district court's reasons* for denying qualified immunity, we may exercise jurisdiction over the appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 689–90 (6th Cir. 1999) (en banc) (ellipsis omitted) (emphasis in *Williams*) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)). Further, a mixed issue of law and fact, including an "ultimate fact," such as whether a party's conduct created a racially-hostile work environment in light of the legal standard, is treated as an issue of law, not an issue of fact. *See id.* at 690 (citing *Whitney v. Brown*, 882 F.2d 1068, 1071 (6th Cir. 1989)). Even where the defendant inappropriately attempts to challenge the basic facts, this Court can "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)).

Bradley claims that Przekop-Shaw's appeal "relies solely on her own disputed view" to argue that the district court incorrectly interpreted the facts. (Appellee Br. 1). However, Przekop-Shaw accepts the facts as established by Bradley, arguing that those facts "do not establish a constitutional violation for the purposes of the qualified immunity inquiry." (Appellant's Br. 1). In *Williams v. Mehra*, we noted that "questions concerning Defendants' conduct—what actions they performed—are questions of subsidiary or basic fact [while] [t]he question of the legal standard . . . is a question of law." 186 F.3d at 690. We then identified a third category, mixed questions of law and fact, over which this court has consistently exercised jurisdiction. *Id.* As in that case, "[t]he question at issue in this case—whether the specifics of

the [Defendant's] conduct, as alleged by [the Plaintiff], could constitute [a constitutional violation]—is a mixed question of law and fact." *Id*. Przekop-Shaw raises a mixed question of law and fact concerning whether the conduct alleged by Bradley satisfies the prima facie requirements for a hostile-work-environment claim. Further, to the extent that Przekop-Shaw challenges the facts as determined below, this Court "can separate an appellant's reviewable challenges from its unreviewable." *DiLuzio*, 796, F.3d at 610 (citations omitted). Thus, we may exercise jurisdiction over this appeal.

V.

"We review the denial of summary judgment on grounds of qualified immunity *de novo* because application of this doctrine is a question of law." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citation omitted). As this is a review of a motion for summary judgment, we "are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted) (alteration in *Scott*). However, this duty "does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott*, 550 U.S. at 380. In light of this, this panel views the facts and any inferences to be drawn therefrom in the light most favorable to Petitioner Bradley.

When considering whether to extend qualified immunity, this Court must consider whether, when taken in the light most favorable to the plaintiff, the facts alleged demonstrate that the defendants violated a constitutional right, and whether that constitutional right was clearly

established. *Pearson v. Callahan*, 55 U.S. 223, 232 (2009). Przekop-Shaw's position is that Bradley's claim fails on the first prong. Specifically she argues that Bradley has not demonstrated a constitutional violation because Bradley has not met the prima facie requirements for establishing a hostile work environment.

To establish a prima facie hostile-work-environment claim, Bradley must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment unreasonably interfered with her work performance or created a hostile or offensive work environment that was severe and pervasive. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829–30 (6th Cir. 1999).[2] In proving hostility, the plaintiff must meet an objective and subjective standard, showing that "the conduct [was] so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Przekop-Shaw challenges Bradley's showing of a prima facie case on the third and fourth prongs.

a. Bradley Has Made A Showing of Racially Motivated Harassment

First, Przekop-Shaw argues that Bradley has failed to establish a prima facie hostile-work-environment claim because she failed to show that any harassment was racially motivated. (Appellant's Br. at 33-43). When considering whether the third prima facie element has been met, this Court may only consider "harassment *based on the plaintiff's race*." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (emphasis in original) (citation omitted). "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use

---

[2] A plaintiff must also typically show that her employer knew or should have known of the racial harassment and failed unreasonably to take prompt and appropriate corrective action. *Fenton*, 174 F.3d at 830. That element is irrelevant here because Bradley is suing Przekop-Shaw directly, *see, e.g.*, *Hickman v. Laskodi*, 45 F. App'x 451, 453 (6th Cir. 2002), and because Bradley's employer, the State of Michigan, is not a "person" subject to suit under 42 U.S.C. § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989).

of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* Thus, a finding of race-based harassment does not require proof that racially derogatory comments were made, but rather Bradley must present evidence that the challenged actions "would not have occurred *but for* the fact that the plaintiff was African American." *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (citation omitted). "An example of the latter approach could include evidence that similarly situated individuals of a different race were not subject to harassment." *Pusey v. United Parcel Service, Inc.*, 393 F. App'x 366, 369 (6th Cir. 2010) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706–07 (6th Cir. 2007)).

The district court determined that Bradley presented a material issue of fact as to whether she was subject to race-based harassment relying on three interactions between Bradley and Przekop-Shaw. (R. 50, ID 818-19). First, the district court found that Bradley had submitted evidence that created a material issue of fact regarding whether Przekop-Shaw "spitefully threatened" to make Bradley work with Lockman. (*Id.* at 818). Second, the district court found evidence to support Bradley's claim that Przekop-Shaw treated Gonea substantially differently from Bradley, though they were classified in the same level and position. (*Id.* at 818-19). Finally, the district court found that there was evidence to support the allegation that Przekop-Shaw treated other African-American employees differently from their white counterparts, based on Przekop-Shaw's denial of a request from the Detroit office, where the secretaries were all black, for a longer than normal lunch to host a holiday luncheon, even though Przekop-Shaw hosted a similar longer than normal luncheon at her home for the Lansing office, which was all white. (*Id.* at 819).

Regarding the first assertion, Bradley claims that on two separate occasions, Przekop-Shaw threatened to transfer Lockman into Bradley's office. According to Bradley, Przekop-Shaw made these statements first in response to Bradley's request for additional secretarial staff and then in retaliation against Bradley for circumventing her authority by reporting inappropriate use of Bradley's government issued credit card to LARA management. (R. 45-4, ID 666-67). Although these incidents are not race-based on their face, Bradley contends that they may be understood as such because Lockman had previously harassed Bradley based on her race.

Przekop-Shaw argues that even if she did propose transferring Lockman to Bradley's unit, which she denies, that should not be considered race-based treatment because there is no evidence in the record that Przekop-Shaw's alleged actions were racially motivated, and in particular no direct evidence that Przekop-Shaw was aware of Bradley's history with Lockman.[3]

---

[3] Bradley's affidavit states in pertinent part only:

2. . . . That in 2010, I was being verbally harassed by a member of the AG's Office, Michael Lockman (a white male) and decided to exit to another part of the work area, to which Mr. Lockman shouted "bring your Black ass back in here". I accepted this bullying and abuse for a period of time but decided to transfer to LARA in the Unemployment Insurance Agency (UIA) . . . .

. . .

5. That on or about February 2011, I met with Ms. Przekop-Shaw and Ms. Welch . . . My first major assignment was to convert the entire Detroit UIA office from manual to the AG's computerized system.

6. That during the meeting, I mentioned my observation and assessment of the assignment (converting several thousands [sic] files) and that it would be impossible to achieve by the end of the year without "additional support staff". Ms. Przekop-Shaw immediately demonstrated her knowledge and authority by suggesting to bring Mr. Lockman on as "additional AG staff."

. . .

10. [Sometime after October 1, 2011], at a meeting still upset with me for elevating the fraudulent attempt to use my credit card, [Przekop-Shaw] spitefully threatened to again transfer Mr. Lockman to the section in [sic] effort to intimidate me based on race if I did not stop complaining of issues in the office and "disobeying her."

(R. 46-5, PID 752–54.) At oral argument, Bradley's counsel asserted that "the person who elevated" the issue of Lockman's alleged harassment was a subordinate of Przekop-Shaw, and that "senior leadership" at the Attorney General's office was aware of the allegations. Therefore, according to counsel, Przekop-Shaw "certainly" knew about the allegations. But counsel could not point to evidence in the record supporting these claims, so we do not rely on counsel's factual assertions.

However, the problem for Przekop-Shaw is that there is no other explanation for the threatened transfer. As an attorney, Lockman was not in a position to alleviate the workload of the secretarial staff, nor would transferring him into Bradley's unit have been a legitimate response to the misuse of Bradley's government credit card. Although Przekop-Shaw denies threatening to transfer Lockman, for summary judgment purposes we must credit Bradley's testimony that she did. Accepting that testimony as true, Przekop-Shaw has not offered any alternative explanation, based on the evidence or common sense, for proposing to transfer Lockman. On this record, a reasonable jury could infer that Przekop-Shaw knew of Lockman's prior racial harassment of Bradley and used that knowledge to intimidate Bradley by threatening to force her to work with Lockman again, particularly in light of Bradley's testimony that Przekop-Shaw was "irate" and "upset" after the credit card incident, and that the subsequent threat to transfer Lockman was delivered "spitefully."[4] (R. 46-5, PID 753-54). It is evident that on this point, this Court has been presented with two contradictory versions by the opposing parties. *Scott*, 550 U.S. at 380. However, neither story "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.*

The district court also concluded that Bradley "present[ed] evidence that [Przekop-Shaw] gave her 'substantially different' treatment from another Division Legal Secretary Supervisor, Amy Gonea, who is Caucasian." (R. 50, ID 818). There is evidence in the record supporting Bradley's claims that she was classified on the same level as Gonea but that Bradley was nevertheless treated as a subordinate to Gonea. In addition to her own testimony, Bradley

---

[4] In concluding otherwise, the dissent loses sight of our obligation to credit Bradley's testimony and draw all reasonable inferences in her favor. Nothing in the record renders Bradley's account unbelievable or forecloses the inference that the threats to transfer Lockman were attempts at racial intimidation. A jury may ultimately believe Przekop-Shaw's version of events – that she did not know about Lockman's racist remark and never threatened to transfer him to Bradley's office – but that is not for this court to decide at the summary judgment stage.

provided the affidavits of former co-workers who testified that they witnessed Przekop-Shaw's mistreatment of Bradley and that Prezkop-Shaw treated Bradley differently than Gonea even though they had the same classification. (R. 45-8, ID 694; R. 46-11, ID 786). Such affidavits have been accepted as evidence supporting the inference that race was a "but-for" condition of the plaintiff's treatment. *See Clay*, 501 F.3d at 706 (finding an inference of race-based harassment where the affiant described with specificity interactions she actually witnessed).

Further, the record also includes the email from Frank Russell, a Human Resources officer, in which Russell states that Bradley appears to be upset by "having to abide by a peer's (Amy's) direction." (R. 45-7, ID 687). He continues that "[r]egardless of whether [Bradley] is classified properly or not, 'currently', she is the same level (I think)." *Id.* In explanation for the apparent difference in treatment of the two women, Przekop-Shaw's counsel explained that Bradley was in fact a subordinate of Gonea's and that the classification level advertised when Bradley applied and accepted her position was an error. (*See also* R. 43-6, ID 511, 517, 519; R. 45-7, ID 687-88).

Russell's email regarding this issue could reasonably be understood to support either Bradley's claim that she and Gonea shared the same classification or Przekop-Shaw's position on Bradley's classification. In a review of a summary judgment decision, this Court is "required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." *Scott*, 550 U.S. at 378 (quotations and citation omitted). A reasonable jury could conclude from Russell's email that Gonea and Bradley were effectively peers, that they should have been treated as peers, that Przekop-Shaw was aware of this, and that she treated them differently in spite of this knowledge. Whether Przekop-Shaw's differential treatment was due to an error in Bradley's classification level or to racial animus is a question of

fact for a jury to decide. Rather than being blatantly contradicted by the record, Bradley's claim that Przekop-Shaw treated Bradley less favorably than her white counterpart draws support from evidence in the record. Because "comparative evidence" that an alleged harasser treated peers of different races differently may be used to show that facially neutral treatment is actually race-based, *Williams v. CSX Transp. Co.*, 643 F.3d at 511, Przekop-Shaw's more favorable treatment of Bradley's white peer may be considered evidence of race-based harassment.[5]

Finally, the district court found further evidence that Przekop-Shaw "treated other African-American employees differently from their white counterparts" in the fact that Przekop-Shaw denied the black Detroit secretaries' request to have a holiday party that exceeded their hour-long lunch break, when Przekop-Shaw herself had hosted a holiday party for the all-white Lansing staff *at her home*. (R. 50, ID 819). Bradley supported her claim that the all-black Detroit secretarial staff was treated differently from the all-white Lansing staff with testimony from a former co-worker who testified about Przekop-Shaw's decision to prohibit the Detroit staff from having their Christmas party other than during their lunch hour. (R. 45-8, ID 693). As with the comparative evidence relating to Przekop-Shaw's treatment of Gonea, this comparative evidence relating to the holiday parties may also be considered in support of Bradley's claim that she was harassed based on her race.

In addition, Bradley also contends that Przekop-Shaw harassed her by "attempting to downgrade her position, . . . berat[ing] her work performance, arbitrarily plac[ing] her on performance-improvement plans, [issuing] groundless counseling statements for asking for assistance, failing to meet with her to discuss her work performance, requiring her to complete

---

[5] In reaching the contrary conclusion, the dissent improperly draws inferences in Przekop-Shaw's favor. A jury *might* conclude from the record evidence that Gonea was Bradley's supervisor based on their positions in the division, even if their classification was the same. But a single email exchange and a few snippets of deposition testimony is no more conclusive evidence of how Michigan's civil service system operates than it is conclusive evidence of racial animus. That is why summary judgment is inappropriate.

unrealistic work assignments before taking annual leave, and denying her comp-time." (Appellee Br. 16).[6] Przekop-Shaw asserts that this conduct may not be considered in support of Bradley's race-based hostile work environment claim because "only harassment *based on the plaintiff's race* may be considered." *Williams v. CSX Transp. Co.*, 643 F.3d at 511. Because none of this behavior is explicitly race-based, Bradley must show a but-for relationship—i.e., that but for the fact that she is African American, this conduct would not have occurred. *Jackson*, 191 F.3d at 662.

However, to the extent that this conduct is an extension of Przekop-Shaw's disparate treatment of Bradley and Gonea, such a link may be permissibly inferred from the evidence. This includes a number of Przekop-Shaw's most consistent complaints about Bradley's performance, such as Bradley's refusal to follow the proper chain of command and work within the management structure, as well as her failure to meet performance objectives that required Bradley to act as a subordinate to Gonea. (*See e.g.*, R. 43-7, ID 524-35; 43-9, ID 545-51; R. 43-10, ID 555; R. 43-12, ID 562-63). Further, because subsequent negative performance reviews often cite a failure to improve on issues raised in prior reviews, the passage of time has a compounding effect. (R. 43-14, ID 568; R. 43-16, ID 574-75; R. 43-18, ID 586) As a result, Przekop-Shaw's favorable treatment of Gonea at the expense of Bradley became a substantial factor in the series of reviews that culminated in Bradley's ultimate dismissal. While these reviews are facially race-neutral, they are at least in part a reflection of Przekop-Shaw's allegedly favorable treatment of Bradley's white counterpart. That Przekop-Shaw made it difficult for Bradley to take leave and tried to force her to work while on medical leave could be viewed by a jury in the same light. Thus, Bradley has presented evidence that "create[s] an

---

[6] The dissent argues that this claim should not be credited because it does not involve a citation to the record. However, the criticism of Bradley's work performance, the performance improvement plans, and the counseling statements are all well documented. The dissent itself references them in its recitation of the facts.

inference, sufficient to survive summary judgment, that her [race] was the motivating impulse for [Przekop-Shaw's] behavior." *Williams v. General Motors Corp.*, 187 F.3d 553, 565–66 (6th Cir. 1999).

Przekop-Shaw also notes that Bradley testified to the fact that employees of different races, including white employees, were subject to harsh treatment by Przekop-Shaw. (Appellant's Br. 33-34 (citing R. 43-2, ID 467-472)). That evidence may persuade a jury that Przekop-Shaw's actions were not race-based. But it does not moot the fact issue created by Przekop-Shaw's disparate treatment of Bradley and Gonea.

b. <u>Bradley Has Made a Showing that the Racially-Motivated Actions Were<br>Sufficiently Severe or Pervasive</u>

Next, Przekop-Shaw argues that Bradley was not subjected to a severe and pervasive hostile work environment. The severe and pervasive requirement contains an objective and subjective component. *Gallagher v. C.H. Robinson Worldwide Inc.*, 567 F.3d 263, 273–74 (6th Cir. 2009). To meet this requirement, Bradley must show that an objectively hostile environment existed and that she subjectively experienced severe and pervasive harassment. *Id.* (citing *Williams v. General Motors*, 187 F.3d at 568). "Although the question of whether conduct is severe or pervasive is quintessentially a question of fact, [this Court] ha[s] earlier affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive." *Clay*, 501 F.3d at 707 (citations omitted).

"[A] hostile work environment . . . typically comprises a succession of harassing acts, each of which 'may not be actionable on its own.'" *Id.* at 708 (ellipses and brackets in original) (quoting *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 638 (2007)). A court determines whether a hostile work environment has been created "by looking at all the

circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Title VII "does not set forth a general civility code for the American workplace," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), and "conduct must be extreme" to amount to a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). However, a "work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode crosses the Title VII threshold." *Williams v. General Motors*, 187 F.3d at 564. A negative performance review, the imposition of a performance improvement plan, or similar actions do not, on their own, show a hostile work environment. *See, e.g. Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000). However, when "seen as a part of the 'constellation of surrounding circumstances,' including [] threatening language" and racially disparate treatment by a supervisor, this conduct "could well be viewed as work-sabotaging behavior that creates a hostile work environment." *Williams v. General Motors*, 187 F.3d at 563.

Considering the totality of the circumstances, *Williams v. General Motors*, 187 F.3d at 562, there is enough evidence to put the question whether Przekop-Shaw subjected Bradley to severe and pervasive race-based harassment to a jury. There is evidence to support the inference that the Lockman incidents, Przekop-Shaw's treatment of Bradley in relation to her treatment of Gonea, and the holiday party incident were racially-based. Threatening to force Bradley to work with someone who had racially harassed her was more than a mere offensive utterance. In addition, Bradley has provided evidence to suggest that the race-based harassment she suffered included daily interactions, emails, and other communications, barriers to her use of leave,

demands that she work while on medical leave, and unfounded negative reviews and counselling memos, all contributing to a "work-sabotaging" hostile work environment. A jury could conclude that Przekop-Shaw's alleged mistreatment of Bradley as compared to Gonea and the interrelated communications, reviews, and counseling memos resulted in ongoing harassment. That Bradley was ultimately terminated in no small part because she refused to subordinate herself to Gonea demonstrates the severity of this harassment and that it unreasonably interfered with Bradley's work performance.

Bradley does more than present a series of isolated offensive events. Rather, she describes "a succession of harassing acts," and though "each of [them] may not be actionable on its own," as a whole they are severe and pervasive enough to comprise a hostile work environment. *Clay*, 501 F.3d at 708. Taken together, the allegations, which Bradley has supported with evidence in the record, portray an environment of almost daily harassment and belittling subordination that persisted and even intensified over a period of years, ultimately resulting in her termination. A reasonable person could, and Bradley did, find such consistent conduct hostile and abusive so as to satisfy the fourth prima facie requirement.

## VI.

Because Bradley has demonstrated a violation of her right to a work environment free of racial harassment, we affirm the district court's order denying defendant qualified immunity and remand for trial.

GRIFFIN, Circuit Judge, dissenting.

There is no Constitutional right to civility in the workplace. A supervisor may issue her subordinates performance-based critiques and at times even decline to invite them to parties at the supervisor's home. But "discourtesy or rudeness should not be confused with racial harassment" any more than unsupported allegations should be confused with evidence. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36–37 (3d ed. 1996) (brackets omitted)). My colleagues permit both substitutions in concluding Susan Przekop-Shaw subjected Sonya Bradley to a racially-hostile work environment. I disagree and would reverse the district court's judgment. Accordingly, I respectfully dissent.

I.

The majority provides some factual background, but understanding the district court's errors requires further context. In particular, it requires a closer examination of Bradley's poor performance under both Przekop-Shaw and Peter Kotula—the individual who personally supervised Bradley for her last year of employment and against whom Bradley failed to muster any evidence of racial harassment. I supply those facts here.

Bradley supervised five legal secretaries in the Michigan Unemployment Insurance Agency's (UIA's) Detroit office and a sixth in the Grand Rapids office. She also served as personal secretary to her direct supervisor, Donna Welch (a Caucasian), the "First Assistant" in the Detroit Unit. Przekop-Shaw sat just above Welch in the chain of command as Chief of the Attorney General's (AG's) Labor Division. She supervised the attorneys and support staff within the UIA, including Bradley, but spent most of her time in Lansing. Defendant visited the Detroit office no more than once a week.

Shortly after beginning in the UIA, Bradley met with Welch and Przekop-Shaw to discuss her first major assignment: converting "the entire Detroit UIA office" from a manual system to the AG's computerized system. Bradley surmised that she needed additional support staff to complete the assignment by the end of the year. According to Bradley, Przekop-Shaw "immediately demonstrated her knowledge and authority by suggesting to bring Mr. Lockman on as 'additional AG staff'" to assist with the conversion. Bradley did not inform Przekop-Shaw of her previous encounter with Lockman, but nonetheless suspected defendant was attempting to expose her to her former harasser.

Welch left the UIA in June 2012, making Przekop-Shaw Bradley's direct supervisor, although she still oversaw Bradley's work from the Lansing office. Plaintiff asserts that upon becoming her direct supervisor, Przekop-Shaw "[i]mmediately . . . attempted to reclassify [her] position to a lower grade, but was unsuccessful." Bradley is presumably referring to her "classification level," which was indeed the same as colleague and fellow head secretary Amy Gonea (a Caucasian). As proof of defendant's efforts to "lower" her grade, plaintiff points to an email Przekop-Shaw sent to Frank Russell, an official in the Human Resources Division of the Michigan Civil Service Commission. Przekop-Shaw does not mention Bradley in the email. She asks Russell if he has time to "discuss certain issues involving the UIA staff," including how to "[r]esolve [a] misclassification" issue. Russell asks defendant if she is referring to Bradley and to describe the issue in more detail. Defendant's response to Russell, assuming she wrote one, is not in the record.

Bradley's testimony sheds additional light on the misclassification issue. She explained that when she first started at the UIA, she "got a call from HR personnel . . . saying that they had posted the position wrong, that it wasn't supposed to be for division head secretary, that there

was an error." Plaintiff therefore understood that whatever inquiry defendant made about her classification was not based on race, but an error in the posting of her position.

Even so, she contends that throughout her time at the UIA, Przekop-Shaw treated Gonea more favorably and improperly permitted her to supervise Bradley. Defendant responds that she treated Gonea like plaintiff's supervisor because Gonea was her supervisor.

The issue boiled over in November 2012, when Bradley discovered another "AG Office staff inappropriately attempted to use [her] personally issued state credit card," which UIA employees used to pay the state's filing fees in unemployment cases. After plaintiff noticed the discrepancy, Gonea emailed her, asking Bradley for her card information so that Gonea could "add [it] to the Attorney General account." Plaintiff did not respond to the email. Instead, she "elevated" the matter "to LARA and the AG['s] Office." "Elevated," in this instance, means Bradley contacted LARA procurement manager LeAnn Droste and the Department of Technology Management and Budget to confirm her understanding that information concerning state-issued cards should not be shared with coworkers. "Both Ms. Droste and [the] DTMB confirmed Bradley's interpretation."

After the incident, plaintiff recalls that, "although in Lansing," Przekop-Shaw "became more irate and defensive" toward her. Bradley is presumably referring to the disciplinary email Przekop-Shaw sent her for overstepping Gonea's authority—an email Russell approved as "a good first step in taking corrective action." Bradley attests that in a subsequent meeting, defendant was "still upset with [her] for elevating the fraudulent attempt to use [her] credit card," and again "spitefully threatened" to transfer Lockman to Bradley's unit.

Plaintiff sought medical leave in early 2013, giving January 17 as her leave date. However, she contends Przekop-Shaw "would make [her] jump through hoops" before leaving.

On the 17th, "during numerous emails and an inappropriate racist phone call from Ms. Gonea, [Bradley] was ordered to complete a series of assignments before leaving for the day." Bradley considered the phone call and assignments racially motivated not because of Gonea's remarks, but because Gonea gave her additional work that prevented her from leaving at her usual time. Bradley insists—without mention of a similarly-situated comparator—that defendant "wouldn't have" subjected other employees to the same treatment.

One of plaintiff's additional assignments was to "certify" her 2012 performance review by viewing it online. Przekop-Shaw rated plaintiff as "meet[ing] expectations" overall, but rated her as "needs improvement" in the majority of individual categories assessed. Przekop-Shaw also offered feedback and a list of specific performance objectives which Bradley described as "insulting, malicious, and disparaging." Defendant's remarks did not include references to race, but were critical of Bradley's work performance.

For example, under team building, Przekop-Shaw lamented that Bradley's working relationship with Welch deteriorated early in 2012, "usually end[ing] in disputes, exchange of disparaging remarks, and denial of responsibility for concerns being expressed." Defendant also recalled that in a meeting with UIA attorneys, "Ms. Bradley vocally became defensive and physically launched herself over the conference table to criticize the attorney who asked her [a] question." Further, while Bradley successfully cleared the backlog of cases in 2011, her efforts in 2012 "ha[d] diminished . . . and a major backlog exists in entering cases within the Unit[']s legal file system." Plaintiff does not dispute these claims.

Bradley took a full eight months off, returning to work in September 2013. Upon her return, Przekop-Shaw asked a number of supervisors to prepare presentations on certain topics for the upcoming "Attorney General meeting" between the Detroit, Lansing, and Grand Rapids

offices. She assigned Bradley "trust building." "In light of [plaintiff's] recent efforts to discuss trust building at [a UIA] staff meeting," defendant considered her "an ideal person to present this topic." But Przekop-Shaw was displeased with Bradley's performance.

During her presentation, Bradley acknowledged the work of her Detroit secretaries, but "deliberate[ly] omitted" mention of the Grand Rapids secretary she supervised remotely. She also "use[d] her alleged workload as an excuse for not completing [her] assigned projects on time." "It was inappropriate for you to reference your workload as the reason that support staff 'volunteers' to assist you," defendant told Bradley. "[T]his reference inappropriately telegraphed to other support staff . . . that they have an obligation to volunteer to assist you." Further, Bradley encouraged her staff to "be forth right" when they felt someone treated them rudely "and advise the person why they're being rude." Finally, plaintiff asked Przekop-Shaw to agree that the Unit's support staff was performing well, which Przekop-Shaw felt inappropriate given plaintiff's awareness of management's "ongoing concerns with the support staff's performance." Defendant issued plaintiff a "formal counseling" memo for the presentation.

Bradley states that "[f]rom that date forward, Przekop-Shaw consistently criticized [her] performance at staff meetings, in front of her staff, and in public." Plaintiff offers no citation for this claim. And the single instance of criticism the district court seized upon—a meeting in which plaintiff was told to "Put [her] big girl panties on"—was leveled at Bradley by another African-American employee from the Human Resources Division. Plaintiff does not allege Przekop-Shaw took part in, or had any role in influencing, this meeting.

In December, each UIA office hosted its own holiday party. But Przekop-Shaw limited festivities in the Detroit office. According to one of plaintiff's coworkers, defendant informed the mostly African-American Detroit unit that they "were not allowed to have a holiday luncheon

as we usually do." "[I]f we did have one it could only be 1 hour which has to be our lunch hour. Well we later found out that Ms. Przekop-Shaw gave a holiday luncheon at her home," with only "her Lansing staff (all white)" in attendance.

Defendant issued Bradley her 2013 performance review in February 2014. Przekop-Shaw rated plaintiff as "needs improvement" overall. She noted that Bradley failed to complete a draft of an "operational procedure manual" for UIA staff, a project Welch assigned to her in 2012. Plaintiff also submitted an incomplete draft of a secretarial procedures manual. Her monthly reports included inaccuracies that inhibited the work of other staff members. And while the AG had "substantial[ly] change[d]" the UIA's procedures in April 2012, Bradley still instructed her staff to follow its former procedures. Finally, Bradley sent "emails question[ing] her supervisor's directions or challeng[ing] the Section Head or the Division Head Secretary's role in assuring proper performance of the unit." Again, Bradley does not contend these criticisms are inaccurate.

Defendant recommended to the Human Resources Division that plaintiff's performance may improve under daily supervision. The AG's office and the Human Resources Division agreed and assigned Kotula as Bradley's Detroit-based supervisor. Under Michigan's Civil Service rules, a "needs improvement" rating triggers a performance improvement plan (PIP), so Kotula developed a PIP for plaintiff with input from Przekop-Shaw and Russell.

The March 2014 PIP required plaintiff to maintain a daily log of activity, develop and finalize the procedural operations and secretarial procedure manuals, and meet her assignment deadlines—or communicate with Kotula ahead of time if a task could not be completed within the allotted time. It also called for overall "improvement in communication and leadership

skills," including "following directives and communicating professionally to build positive relationships with leadership, co-workers, and staff."

Bradley did not satisfy these requirements. Within the same month Kotula placed her on a PIP, plaintiff refused to follow instructions from the new "First Assistant" Debbie Taylor to "have [her] staff sign in to their computers using their established user ID and log in" information. Plaintiff told Taylor she would not comply with the direction "until [she] had received those instructions in writing." Kotula issued plaintiff a formal counseling memo for the incident. Later, he placed plaintiff on an "Interim Employee Rating," providing notice that she had not complied with the terms of her PIP.

Kotula issued plaintiff two more formal counseling memos in November 2014. The first focused on emails Bradley sent while she was out of the office, which Kotula considered "either confusing," or "completely inappropriate." The second warned plaintiff of her "ongoing failure to meet the performance expectations set forth" in her PIP. This counseling memo accompanied plaintiff's "Interim Rating Progress Review"—in which Kotula concluded that plaintiff's overall performance remained unsatisfactory. Detailing the reasons for the rating, Kotula stated: "You have been disruptive and inappropriate at managerial staff meetings. . . . Additionally, you have demonstrated an inability or unwillingness to meet established deadlines. You often fail to respond to the members of your management team when they inquire about the status of an assignment given to you or a missed deadline." "Cases are not being opened timely, and assigned tasks are not tracked or completed in a timely manner." Moreover, "in response to inquiries concerning the status of work assigned to [her]," plaintiff "forwarded numerous files to the Lansing office so that staff there could complete tasks which are [her] responsibility."

Kotula reviewed plaintiff's performance again in December 2014. He concluded Bradley's work was still lacking and issued her a fifth formal counseling memo listing the deficiencies. For example, Bradley understood, but was not using, the "Sections email assignment system" to track her assignments, making it difficult for others who were using the mandated system to find her work. Bradley also declined to instruct her staff regarding certain "assignment protocols," which "in her opinion, [were] not part of her printed directions and procedures." Her productivity issues also persisted—the Detroit office had to transfer a number of Bradley's case files to Lansing after plaintiff failed to open them in a timely manner. Of the 130 email assignments generated in the UIA between October 30 and November 14, Bradley's staff completed only 82. "Ms. Outwater accounted for 77 assignments; Ms. Jackson reported 5 completed assignments; and Ms. Bradley reported 0 completed assignments." Kotula subsequently extended plaintiff's Interim Rating Period through March 2015.

By February, he issued Bradley two more formal counseling memos. Again, the first involved plaintiff's email communications, specifically, an email she sent Kotula concerning Taylor. In it, Bradley explained that Taylor "seems to be creating new work protocols that are just the opposite of past practices" and sought Kotula's assistance in correcting her. "Furthermore," she added, "Ms. Taylor recently suggested that if I place documents in my work area . . . that may be in her viewing sight, she will take or even destroy them." Kotula deemed the email "inappropriate," "accusatory," and "unprofessional."

Kotula issued the second February counseling memo in conjunction with plaintiff's second unsatisfactory Interim Rating Progress Review. The memo spells out the occasions wherein Bradley failed to complete her assignments, communicated in an inaccurate or unprofessional manner, or did not follow instructions. After a final meeting to discuss her

performance in March 2015—which Przekop-Shaw did not attend—the UIA terminated Bradley's employment.

## II.

I agree with the majority on a few basic points. First, we have jurisdiction to decide whether, under the facts presented, Prezkop-Shaw violated plaintiff's clearly established right to be free of a racially-hostile work environment. *Williams v. Mehra*, 186 F.3d 685, 689–90 (6th Cir. 1998) (en banc); *see also Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 479 (6th Cir. 1989); *Poe v. Haydon*, 853 F.2d 418, 428–29 (6th Cir. 1988). Second, I agree this case turns primarily on the third and fourth elements of plaintiff's claim—whether Przekop-Shaw harassed Bradley based on race, and whether the harassment created an abusive work environment. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). I disagree, however, with the majority's application of the summary judgment and hostile work environment standards.

Our "duty to view the facts in a light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "To make out a *genuine* issue of material fact, [the] plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Id.* at 913. Qualified-immunity plaintiffs are no exception. *Id.* Bradley's evidence must also be specific. *See Matsushita Elec. Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). She cannot defeat defendant's motion by "replac[ing] conclusory allegations of the complaint . . . with [the] conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).

Further, to succeed on her substantive claim, the complained of conduct must be *objectively* hostile. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).[1] Title VII does not create a "general civility code" for the American workplace, *Faragher*, 524 U.S. at 788 (citation omitted), and neither does § 1983 in its place, *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008). As a result, we have said that "minor social slights" like the failure to invite an employee to a holiday party—*even if based on race*—"must [be] entirely discount[ed]." *See Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (addressing failure to invite the plaintiff to office pizza parties in the age-discrimination context).

Bradley has not made either showing. First, her claims of racial harassment are unsupported and, at times, even contradicted by the record. Second, her allegations are insufficient to establish a racially hostile work environment as a matter of law. The district court therefore erred in denying Przekop-Shaw's motion for summary judgment.

In reaching the opposite conclusion, the majority relies on three incidents the district court cited in finding a genuine issue of material fact: (1) that defendant, on two occasions, threatened to transfer Lockman to Bradley's work area; (2) that defendant treated Bradley "substantially different" than Gonea; and (3) that defendant treated the African-American staff in the Detroit office less favorably than the mostly Caucasian Lansing staff because she neglected to invite them to a party. Additionally, the majority credits plaintiff's broad assertion that Przekop-Shaw: (4) "attempt[ed] to downgrade her position[,] . . . berated her work performance,

---

[1] "This Circuit has held that the required elements of *prima facie* proof necessary for a plaintiff charging a racially hostile work environment under both Title VII and 42 U.S.C. § 1983 are the same." *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 202 (6th Cir. 1993).

arbitrarily placed her on performance-improvement plans, [issued her] groundless counseling statements for asking for assistance, fail[ed] to meet with her to discuss her work performance, requir[ed] her to complete unrealistic work assignments before taking annual leave, and den[ied] her comp-time"—a run-on claim which appears in plaintiff's brief without citation to the record. I address each in turn.

A.

*Przekop-Shaw's threats to transfer Lockman.* Bradley attests that defendant twice threatened to transfer Lockman, the attorney who made a racially-charged comment toward Bradley, to Bradley's unit. Yet these threats can be taken as proof of race-based mistreatment only if Przekop-Shaw *knew* of Lockman's harassing behavior. Plaintiff presents no evidence that she did.

Defendant testified she "had no knowledge of any interaction between Mr. Lockman and Ms. Bradley" before Bradley filed her complaint. Nothing in Bradley's affidavit (from which the majority takes most of its facts) suggests otherwise. Plaintiff did not attest, for instance, that she told Przekop-Shaw about Lockman's remark. In fact, she did not attest, testify, or claim in her brief that she informed anyone of Lockman's harassment at any time. Nor does her amended complaint include facts permitting an inference that defendant knew of the harassment. Indeed, this was one of the reasons the district court dismissed her disparate treatment claim against defendant on the pleadings:

> Plaintiff alleges that Defendant Przekop-Shaw "became enraged with Plaintiff and spitefully threatened to transfer Mr. Lockman to the section in effort [sic] to intimidate Plaintiff and allow him to continue to harass and bully Plaintiff if she did not stop complaining of issues in the office and 'disobeying her.'" This, also, is a conclusory allegation, as Plaintiff does not indicate that Defendant Przekop-Shaw even knew of the alleged racial statement made by Mr. Lockman.

"Accordingly," the district court could not "even draw the inference" that defendant's reference to Lockman "was a spiteful threat of intimidation and harassment." Neither can I.

When asked at oral argument what evidence supports her assertion that defendant knew of Lockman's harassment, plaintiff's counsel explained that another unnamed employee, *who he declined to depose*, reported the incident to "the AG's Office." My colleagues agree he "could not point to evidence in the record" demonstrating that Bradley, or anyone else, "elevated" the harassment issue to "senior leadership" in the Attorney General's office (whoever that may be).[2] Still, Bradley implies defendant must have known about Lockman's conduct because "Przekop-Shaw and Mr. Lockman worked together in the Attorney General['s] Office." Bradley offers no record citation for this claim because there is no evidence they did.

Taking plaintiff's unproven allegations as evidence is a running theme for the majority. It concludes Bradley can create a genuine issue of fact by questioning the validity of defendant's evidence, without presenting her own "affirmative evidence" "sufficient to allow a jury to return a verdict in [her] favor." *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010). "[T]his is precisely the argument" the Supreme Court "rejected in *Celotex*." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 560 (6th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the proofs "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

---

[2] Counsel also argued that we can infer defendant's inappropriate intent because Lockman is an attorney and, therefore, reasons the majority, "was not in a position to alleviate the workload of the secretarial staff, nor would transferring him to Bradley's unit have been a legitimate response" to Bradley's credit card complaint. Such an inference is supportable only if we assume plaintiff's theory is true—that Przekop-Shaw knew Lockman had harassed Bradley. We cannot make this assumption because, as even the majority agrees, there is no evidence she did. Bradley's characterization of Przekop-Shaw's demeanor as "spiteful[]" and "upset" (made in an affidavit, *not* in testimony, as the majority states) is not proof that Przekop-Shaw knew of the harassment. One does not "lose[] sight of [one's] obligation to credit Bradley's testimony" when that testimony does not, in fact, support her claims of defendant's knowledge.

But once the movant discharges this responsibility, the nonmovant bearing the burden of proof at trial must respond. She must "go beyond the pleadings and by her own affidavits, or by [other evidence] on file, designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Bradley has not designated any such facts.

Plaintiff may believe defendant was aware of the harassment at the time she "spitefully threatened to transfer" Lockman, but her belief is based on suspicion alone; no record-supported facts permit this inference. If we cannot reasonably infer that Przekop-Shaw knew of Lockman's harassment, we likewise cannot reasonably infer that she threatened to transfer him to plaintiff's unit on account of plaintiff's race. *See Williams*, 643 F.3d at 511 (facially neutral conduct qualifies as race-based harassment only if "it would not have occurred but for the plaintiff's race"). Accordingly, these threats do not carry any weight in the hostile work environment inquiry.

*Przekop-Shaw's more favorable treatment of Gonea*. The majority next concludes "[t]here is evidence in the record" to support Bradley's claim that Przekop-Shaw treated her less favorably than Gonea—and there is, although it does not rebut defendant's motion for summary judgment.[3]

Przekop-Shaw testified that, despite their shared classification, Gonea and Bradley were "[n]ot in the same department." Whereas plaintiff served as the head secretary of the UIA, a unit within the AG's Labor Division, Gonea served as the head secretary of the *Labor Division*—

---

[3] The majority points to two "affidavits of former co-workers" who claimed to witness defendant's mistreatment of Bradley. The first states, without context: "Ms. Przekop-Shaw with the help of [several subordinates] totally stripped Ms. Bradley of all her authority, and Ms. Bradley was treated as if she was not a part of management yet Ms. Gonea who is the same classification of Ms. Bradley was not stripped of any authority." The second states: "Ms. Bradley was treated differently than her white colleague Ms. Amy Gonea," and "Amy Gonea treated Ms. Bradley as a subordinate instead of a co-worker and was disrespectful." Affidavits like these, consisting of "vague, conclusory allegations" and subjective beliefs are insufficient to withstand a motion for summary judgment. *Hartsel v. Keys*, 87 F.3d 795, 803–05 (6th Cir. 1996); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992).

"charged with overseeing all secretarial functions" within its units. In that sense, Gonea was part of the secretarial management team and above Bradley in the chain of command. Defendant explained this to Bradley, although Bradley was unhappy with the arrangement. Plaintiff's dislike of her employer's governing structure is not proof of a hostile work environment.

Rather than engage with defendant's testimony, the majority points to an email in which Frank Russell observed that Bradley must have been upset at "having to abide by a peer's ([Gonea's]) direction." But Russell's statement taken as a whole does not create a question of fact. The email in question is Russell's response to the disciplinary email Przekop-Shaw sent plaintiff after plaintiff ignored Gonea's request for her government-issued credit card information. Przekop-Shaw consulted with Russell before emailing Bradley because she had to obtain his approval before issuing any discipline. While Russell identifies Gonea as Bradley's peer, he explicitly reiterates his approval of Przekop-Shaw's decision to discipline Bradley for ignoring Gonea's directions—confirming defendant's testimony that Gonea was, in fact, Bradley's supervisor. "This would have been a good first step in taking corrective action," he states. "The content of your email expressing your concerns would have been perfect for a Formal Counseling Memorandum." Thus, Russell agreed with defendant's warning to plaintiff: that Bradley, as "a section head secretary," does not "trump the Division head secretary's authority."

Unsatisfied with this evidence, the majority concludes that a jury should decide whether Przekop-Shaw treated Bradley differently "due to an error in Bradley's classification level or [due] to racial animus." I disagree. For one, my colleagues appear to assume that Gonea's equal classification precludes her from being plaintiff's supervisor. Nothing in Russell's email (or the record) suggests that supervision of one employee by another of the same classification is

improper, or contrary to Michigan Civil Service protocol. If anything, Russell's decision to approve the discipline while knowing that Gonea and plaintiff have the same classification suggests just the opposite—that classification is not indicative of supervisory status.

For another, to the extent my colleagues require proof that plaintiff should have been classified at a lower level before Gonea could supervise her, they have it. Bradley testified that when she was first hired, "HR personnel" informed her that they had "posted [her] position wrong" with an incorrect classification level. Plaintiff's admission is further proof that she did not "trump" Gonea's authority.

Ultimately, plaintiff's only counter to defendant's explanation is her assertion that "Ms. Gonea was not in Bradley's chain of command." She gives no record citation for this claim, and the evidence does not support it. Defendant's treatment of plaintiff's supervisor as her supervisor is not race-based conduct. This claim does not weigh in the hostile work environment analysis.

*Przekop-Shaw's mistreatment of the Detroit staff.* This claim is based on one event: Przekop-Shaw's failure to invite the majority African-American staff from the Detroit office to a party she hosted at her home for the majority Caucasian staff from the Lansing office. Because employees in the Detroit office are predominantly African American, (and because plaintiff submitted evidence to support this assertion), one can infer this was a race-based exclusion. This event—and only this event—is therefore a part of the circumstances considered in the hostile work environment inquiry.

"Isolated incidents, however, unless extremely serious will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Denying staff an invitation to a holiday party is rude. But "extremely

serious" it is not. *See Crawford*, 96 F.3d at 836 (describing exclusion from office parties as a "minor social slight[]"). Plaintiff must therefore point to further race-based conduct to demonstrate her workplace was the type "a reasonable person would find hostile or abusive." *Bowman*, 220 F.3d at 463. As explained, she has not.

*Other claims against Przekop-Shaw*. Plaintiff's remaining list of grievances, that Przekop-Shaw "attempt[ed] to downgrade her position[,] . . . berated her work performance, arbitrarily placed her on performance-improvement plans, [issued her] groundless counseling statements for asking for assistance, fail[ed] to meet with her to discuss her work performance, requir[ed] her to complete unrealistic work assignments before taking annual leave, and den[ied] her comp-time," are alleged in her brief without citation to the record. This alone is reason enough to reject them. But, on top of that, there are others.

First, plaintiff has not shown that Przekop-Shaw was even responsible for things like "comp-time,"[4] and it is undisputed that Kotula, not Przekop-Shaw, issued the majority of plaintiff's "performance-improvement plans" and "counseling statements." In a constitutional action against defendant in her individual capacity, *see* 42 U.S.C. § 1983, this is a dispositive oversight. "When suing an individual actor, such as [Przekop-Shaw], for constitutional violations under § 1983, a plaintiff must demonstrate that the actor 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out h[er]self." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). That is, a defendant accused of unconstitutional discrimination must be "personally involved in the

---

[4] I note, moreover, plaintiff failed to demonstrate that she was denied comp-time based on race. When asked whether she could name a comparable employee who was granted overtime or "comp-time" when defendant denied it to her, Bradley identified another African-American employee, working under a different supervisor, in a different department.

alleged misconduct" to be personally liable for it. *Foster v. Michigan*, 573 F. App'x 377, 394 (6th Cir. 2014) (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)).

Complicating this issue further, my colleagues imply that defendant can be held liable for the negative reviews Bradley received from Kotula, because "subsequent negative performance reviews often cite failure to improve on issues raised in prior reviews," creating a "compounding effect" over time. But insofar as there is a legal theory under which Przekop-Shaw can be held responsible for Kotula's decisions, § 1983 is not it. "Under § 1983, there is no *respondeat superior* or vicarious liability," which is precisely why Bradley must establish defendant's "direct[] participat[ion]" in order to win a judgment against her. *Flagg*, 715 F.3d at 174 (citation omitted).[5] For some of these conclusory allegations, plaintiff has failed to make this showing.

Second, a number of Bradley's claims mischaracterize the record, starting with the assertion that defendant "attempt[ed] to downgrade" her position. Plaintiff's evidence does not demonstrate this event actually happened. She points to the email exchange between Przekop-Shaw and Russell in which defendant asks about employee "misclassification," but does not mention Bradley, much less ask that she be "downgrade[d]." The majority rightly notes "[i]t does not appear from the record that any change was made," but it is more accurate to say "it does not appear from the record that any change" was even requested. Further, it is undisputed that Przekop-Shaw's inquiry to Russell was not racially motivated; Bradley acknowledged her position classification had been posted in error.

---

[5] The majority's related claim—that "Przekop-Shaw's favorable treatment of Gonea at the expense of Bradley became a substantial factor in the series of reviews that culminated in Bradley's dismissal"—is inaccurate. Again, Kotula supervised Bradley, gave her assignments, assessed her performance, and recommended her termination during her last year of employment. There is no evidence Przekop-Shaw was involved in the decision to discharge Bradley. Termination, moreover, is a "[d]iscrete act," which is a "separate actionable 'unlawful employment practice'" distinct from a hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002). And plaintiff lost on this claim. The district court dismissed her disparate treatment action at the pleading stage because, again, Bradley offered only "conclusory assertions" with "no facts to support" them. Plaintiff did not cross-appeal this ruling; resurrecting the claim on her behalf is improper and beyond the scope of our jurisdiction.

The record also belies plaintiff's suggestion that Przekop-Shaw prevented her from taking leave. During her four years at the UIA, Bradley took approximately nine months of leave—eight of which Przekop-Shaw approved while Bradley was under her immediate supervision. While the majority omits this fact, I cannot. Determining whether a genuine issue of fact exists requires "addressing *all* the facts in the record—including those that uniformly cut against the plaintiff." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc). That Gonea, and not defendant, gave Bradley additional work to do before leaving for the day is not proof of racial harassment absent evidence that defendant treated persons outside the protected class differently, and Bradley offers none.

An even greater mischaracterization is the implication that Przekop-Shaw's critiques of Bradley's work performance were unjustified. Plaintiff at no point disputes the factual accuracy of the criticism she received from defendant or Kotula—and indeed, seems to concede that she failed to complete assignments in a satisfactory or timely manner.[6] "Without more," negative performance assessments—particularly those based on merit rather than protected status— "cannot 'create an environment that a reasonable person would find hostile or abusive.'" *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 464 (6th Cir. 2006) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000)).

The majority does not dispute that defendant carried her burden to "inform[] the court of the basis for [her] motion" and identify evidence "which [she] believes demonstrates the absence of a genuine issue of fact." *Celotex*, 477 U.S. at 323. Nevertheless, it insists we must accept

---

[6] Bradley instead argued defendant made her job impossible by assigning her an unreasonable number of tasks and denying her the resources necessary to get the job done. However, this claim is inaccurate. Management granted plaintiff's request to hire an additional secretary, as well as a word processing assistant in 2011, not long after Bradley started. By the time defendant became Bradley's supervisor in 2012, it is not clear that she had authority to grant Bradley's request for additional staff. Plaintiff acknowledged the UIA could not hire temporary assistants without approval from LARA and had reduced its budget and cut staff at the AG's orders. And there is no evidence defendant provided employees outside the protected class the assistance she allegedly denied to plaintiff.

Bradley's facts as true unless they are "blatantly contradicted" or "utterly discredited by the record." (Maj. Opn. (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))). Some of them are. But more to the point, before we can accept Bradley's facts as true, plaintiff must step forward with a record-supported version of the facts in the first instance. She has not.

"A plaintiff cannot simply sit back and highlight deficiencies in the defendant's argument without providing some affirmative support for [her] own position." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012). Nor can she simply move the conclusory allegations of her complaint into a conclusory affidavit. *Lujan*, 497 U.S. at 888. She must "make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue of material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

Here, a trial is not necessary. At most, plaintiff has shown that defendant neglected to invite her and other African-American employees to a holiday party at her home. This is a "minor social slight[]"; not a racially-hostile work environment. *Crawford*, 96 F.3d at 836. "[Holiday] parties are simply not a term, condition, or privilege of employment of which Congress has taken cognizance." *Id.* The district court erred in concluding otherwise.

## B.

Our court "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). Bradley's claims do not reach it.

The behaviors that typify a racially-hostile work environment are not subtle. Most cases do not include "minor social slights" like denying an employee an invitation to a party. *Crawford*, 96 F.3d at 836. They instead include supervisors' routine use of the N-word and other

racist terms, graffiti referring to the "KKK" and depicting lynchings in common areas, the award of stickers for firing minority workers, vandalism to personal property with racial epithets, denial of promotions to and disproportionate discipline of African-American employees, display of a swastika, and even physical assault. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 651–56 (6th Cir. 1999); *see also e.g.*, *Jordan v. City of Cleveland*, 464 F.3d 584, 597–98 (6th Cir. 2006) (a reasonable jury could find a hostile work environment where, "for more than a decade," the plaintiff was subject to "confrontational and caustic behavior," "various racial slurs, demeaning jokes and inflammatory graffiti," "isolation and segregation," and "disparate discipline and additional duties"). Hanging nooses, drawing offensive caricatures, and employee refusal to respond to sensitivity training may also evince a workplace so "permeated with discriminatory intimidation, ridicule and insult," no reasonable person could tolerate it. *Harris*, 510 U.S. at 21; *see, e.g.*, *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 882–84, 887 (6th Cir. 2008) (detailing such facts). While no list is exhaustive, the deeply offensive nature of the foregoing acts underscores what the Supreme Court "made . . . clear" in *Faragher*: "conduct must be extreme to amount to a change in the terms and conditions of employment." 524 U.S. at 788.

Plaintiff's events are not extreme. Even if she could prove them, the three incidents the district court cited in finding an issue of fact—that defendant (1) twice threatened to transfer Lockman to her work area; (2) treated Gonea more favorably; and (3) denied plaintiff and other African-American staff an invitation to a party at her home—are well beneath the "relatively high bar" the case law demands. *Phillips*, 854 F.3d at 328. Certainly, no reasonable actor in Przekop-Shaw's position would have known that her conduct was on par with those who routinely use racial slurs, deface personal property with racial epithets, hang nooses, or physically assault employees. *See Chappell*, 585 F.3d at 907 ("Qualified immunity ordinarily

- 40 -

applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful.").

Nor are plaintiff's events objectively severe or pervasive. Przekop-Shaw was plaintiff's immediate supervisor for approximately twenty-two months (eight of which plaintiff took off with Przekop-Shaw's approval). In that time, and throughout plaintiff's four years at the UIA, the parties agree that Przekop-Shaw generally visited the Detroit office no more than once a week.[7] A supervisor may be able to harass her subordinates from a remote location, but her capacity to "permeate[]" the workplace with "discriminatory intimidation, ridicule, and insult" severe and pervasive enough to alter the conditions of their employment is likely diminished by such distance. *Harris*, 510 U.S. at 21. This is so because "the actionable wrong" in a hostile work environment claim "is the environment, not the individual acts that, taken together, create the environment." *See Clay v. United Parcel Service*, 501 F.3d 695, 707–08 (6th Cir. 2007) (citation omitted) (affirming the district court's finding that "fifteen specific incidents spanning a two-year period were isolated and were not pervasive"). An environment is fundamentally holistic. It does not "occur on any particular day," but is marked by repeated conduct occurring "over a series of days or perhaps years." *Morgan*, 536 U.S. at 115. A supervisor has less impact on its character when she is not physically present there for "a series of days" at a time.

III.

Applying the appropriate standards, Bradley has not shown that defendant subjected her to an environment so "permeated with discriminatory intimidation, ridicule, and insult" that a reasonable person would find it intolerably hostile or abusive. *Harris*, 510 U.S. at 21. Nor has she demonstrated that a reasonable officer in Przekop-Shaw's position would have known that

---

[7]The majority's claim that defendant and plaintiff had "daily interactions" is incorrect. Bradley and Przekop-Shaw were often not even in the same office. Even plaintiff agrees "[i]t should be noted that Przekop-Shaw worked primarily in the Department's Lansing office, visiting Detroit approximately one day per week."

her conduct created such an environment.  For these reasons, I would reverse the district court's

denial of qualified immunity and remand for entry of summary judgment in favor of defendant.

I respectfully dissent.